# United States Court of Appeals
## For the First Circuit

No. 09-1211

JORGE FRANCISCO SÁNCHEZ;
DOLORES SERVICE STATION AND AUTO PARTS, INC.,

Plaintiffs, Appellees,

v.

ESSO STANDARD OIL COMPANY (PUERTO RICO),

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Lipez, Hansen,[*] and Howard,
Circuit Judges.

Tynan Buthod, with whom Scott Janoe, Karlene Poll, Baker Botts LLP, Carla Garcia-Benitez, and O'Neill & Borges were on brief, for appellant.
Orlando Cabrera-Rodriguez for appellees.

June 19, 2009

[*] Of the Eighth Circuit, sitting by designation

**LIPEZ**, **Circuit Judge**.  This interlocutory appeal requires us to assess the validity of a preliminary injunction order entered pursuant to the federal Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901-6992k.  Invoking RCRA's citizen-suit provision, which allows private plaintiffs to bring suit to enforce the Act's requirements, Dolores Service Station and Auto Parts, Inc., and its operator, Jorge Francisco Sánchez, sued Esso Standard Oil Company (Esso) in federal district court in Puerto Rico.  For over two decades, Esso was Dolores Service Station's gasoline and diesel fuel supplier as well as the owner of three Underground Storage Tanks (USTs) on the property.  The complaint asserted that, at some point during Esso's ownership of the USTs, the tanks had leaked petroleum-related substances into the surrounding soil and groundwater.  Plaintiffs alleged that Esso's subsequent failure to comply with federal and Commonwealth environmental regulations governing reporting and remediation of such leaks had resulted in unacceptable levels of contamination, thereby creating a serious public health hazard.

Shortly after filing their complaint, plaintiffs sought a preliminary injunction that would order Esso to immediately comply with various environmental regulations, investigate the extent of the contamination, and implement remedial measures to clean up the site and prevent any further contamination.  After a two-day hearing, the district court granted plaintiffs' motion,

-2-

entering a preliminary injunction and issuing a supporting opinion that contained a number of factual findings and legal conclusions. The order itself set forth a process for the completion of a comprehensive site assessment "before the court further order[ed] Esso to remediate soil and groundwater contamination at the site." The order "enjoined and restrained" Esso "from contributing by action or inaction to further environmental contamination at the site," and stating that "Esso will be ordered, depending on the results of the Comprehensive Site Assessment, to pay for all necessary testing, corrective actions, and removal of all pollution and contamination within the site and into adjacent areas."

Esso now challenges this order. Besides two threshold jurisdictional challenges that we reject, Esso argues primarily that the preliminary injunction is invalid because it demonstrates that "liability has been summarily determined without discovery [and] without the benefit of a trial on the merits." Because we agree with that contention, we vacate the order to the extent that it represents an improper adjudication of the merits of the dispute. However, we leave intact the provisions concerning an environmental assessment of the allegedly contaminated site.

**I.**

**A. Factual and Procedural Background**

Plaintiff Jorge Francisco Sánchez and his family have operated Dolores Service Station and Auto Parts, Inc. in Canóvanas,

-3-

Puerto Rico since the early 1960s. In or around 1985,[1] Esso replaced Shell Oil as the station's gasoline and diesel fuel supplier and also purchased three USTs - two gasoline and one diesel - underneath the station. Esso provided gasoline to the service station until October 2008, when it stopped supplying gasoline for retail stations generally and sold its equipment, including the USTs underneath the Dolores Service Station, to Total Petroleum.[2] During the time that Esso was supplying the service station, the company replaced both the diesel and the gasoline USTs at least once.

On October 6, 2008, plaintiffs sued Esso in the United States District Court for the District of Puerto Rico, alleging, inter alia, violations of the Solid Waste Disposal Act, as amended by RCRA, 42 U.S.C. §§ 6901-6992k, and related federal and Commonwealth environmental regulations. The complaint asserted that Esso's failure to properly store and dispose of petroleum

_____

[1] The record contains contradictory information regarding when exactly Esso purchased the USTs and began supplying the station; the parties' briefs on appeal state that this occurred in 1985 and the complaint alleges a date of 1984, but the district court found that the sale took place in 1982. Ultimately, however, this discrepancy is irrelevant to this appeal.

[2] At the injunction hearing, counsel for Esso informed the court that the contract between Esso and Total Petroleum contains provisions regarding the assignment of liability for preexisting contamination. This document, however, is irrelevant for our purposes. While Esso denies its responsibility for any alleged contamination at the site, it does not claim that it is an inappropriate defendant.

-4-

products had resulted in the discharge of hazardous waste, including benzene and other petroleum-related hydrocarbons, into the soil and groundwater below the Dolores Service Station. Plaintiffs averred that Esso had been aware of the contamination since at least 1993 but had not properly reported, investigated, mitigated, or remedied the situation. Plaintiffs sought injunctive relief and costs under RCRA. Then, on November 7, 2008, they requested a preliminary injunction, which defendants opposed. At the two-day hearing on December 2 and 3, 2008, both parties called several witnesses and introduced documents into the record.

The district court issued its Preliminary Injunction Findings and Order on December 5. Crucially, the court found that the site underneath the Dolores Service Station had been contaminated with various petroleum-related substances, including Total Petroleum Hydrocarbon (TPH) and benzene, and potentially lead, for over a decade. The court concluded that Esso had known about this contamination since at least 1993, but had failed to investigate, report, or remediate the pollution. Accordingly, Esso appeared to be "in continuous violation" of federal and Commonwealth regulations.

The injunction order required the parties to submit recommendations for companies that could perform a comprehensive site assessment to determine the nature and scope of the soil and groundwater contamination originating from petroleum products

dispensed at the service station during Esso's ownership of the tanks. The court then scheduled a hearing to "consider the implementation" of the environmental testing, and required the parties to promptly "jointly notify the EQB and the EPA" about the issuance of the injunction. Finally, the court enjoined Esso from contributing "by action or inaction" to further contamination at the site, and stated that "depending on the results" of the testing, that "Esso will be ordered . . . to pay" for all of the necessary testing and remediation. The district court subsequently denied Esso's motion for reconsideration, its request that the court require plaintiffs to post a bond for the estimated $75,000 cost of the Comprehensive Site Assessment, and its motion to stay enforcement of the injunction pending this appeal.

## B. Esso's Appeal

After losing below, Esso filed with this court an "emergency" motion to stay the preliminary injunction order pending its interlocutory appeal. In their opposition to Esso's Motion to Stay, the plaintiffs contended that the stay was not warranted because "the trial on the merits was held" at the preliminary injunction hearing.

We denied Esso's request for a stay to the extent that it pertained to "the completion of a comprehensive site assessment and the completion of a remedial plan." However, we granted the request "to the extent the district court order can be read to

require defendant to undertake any remedial measures in advance of the preparation of a remedial plan, except as may become necessary to remedy any emergent threat to human health or safety." We also directed the parties to confer and determine whether this appeal should be expedited.

After we issued this order, the district court entered the following Notice:

> Regarding the Order by the Court of Appeals dated March 16, 2009, in Case No. 09-1211, this court states that, consistent with the Court of Appeals' Statement, it was never our intention to require Defendant to undertake any remedial measures in advance of the preparation of a remedial plan, except as may become necessary to remedy any emergent threat to human health or safety.
>
> We strongly recommend that the appeal on the preliminary injunction be handled on an expedited basis as suggested by the Court of Appeals.

Despite this notice, the district court never amended the preliminary injunction itself.

On the parties' motion, this appeal was expedited. Meanwhile, the comprehensive site assessment has been completed and, as of the time of oral argument on May 6, 2009, the parties were awaiting the reports that would reveal the nature and extent of any potential contamination at the site. Aside from the site assessment, however, it appears that discovery in the district court has been stayed pending this appeal. After Esso contacted plaintiffs to schedule a discovery conference pursuant to Rule 26

of the Federal Rules of Civil Procedure, plaintiffs responded with an "urgent" motion to stay all discovery, arguing that discovery was not warranted because the case "had already been heard" and the relevant documents had been "produced in open court" at the preliminary injunction hearing.

## II.

### A. Statutory and Regulatory Background

Subchapter IX of RCRA regulates USTs. 42 U.S.C. §§ 6991 - 6991(m). Pursuant to this statutory authority, the Environmental Protection Agency (EPA) has promulgated a series of regulations that include provisions relating to UST registration, leak detection, notification, and cleanup requirements. See generally 40 C.F.R. Part 280. The EPA is also empowered to delegate UST program administration to a state if that state's regulatory requirements are at least as stringent as their federal counterparts, 42 U.S.C. §§ 6991c, 6991g. It has delegated that task to Puerto Rico's Environmental Qaulity Board (EQB), which is the entity responsible for administering the UST program. See 40 C.F.R. § 282.102(a). "The EQB is an administrative agency created by the Environmental Public Policy Act, 12 L.P.R.A. §§ 1121-1140a, to promote environmental and resource conservation." Esso Std. Oil Co. v. Cotto, 389 F.3d 212, 213-14 (1st Cir. 2004). Consistent with this federal delegation, the EQB's Underground Storage Tank Program (USTP) is governed by a set of rules called the Puerto Rico

-8-

Underground Storage Tank Control Regulations (USTCR), which were enacted on November 7, 1990. In March of 1998, the government of Puerto Rico and the EPA entered into a Memorandum of Agreement establishing the manner in which RCRA and the USTCR would be enforced. See 40 C.F.R. § 282.102.

The EQB's rules, like the federal UST regulations, are designed to prevent and detect releases from USTs, and correct the problems created by those releases. See Environmental Protection Agency, "Musts For USTs: A Summary Of Federal Regulations For Underground Storage Tank Systems," EPA 510-K-95-002 (July 1995), available at http://www.epa.gov/OUST/pubs/musts.pdf (last visited June 15, 2009). They impose a strict regime of monitoring, reporting, and remediation requirements, many of which are at issue in this litigation.

**B. Citizen Suits Under RCRA**

A common tool in federal environmental law, a citizen suit is "[a]n action under a statute giving citizens the right to sue violators of the law . . . and to seek injunctive relief and penalties." Black's Law Dictionary 261, (8th ed. 2004). "Typically, citizen suits, where they exist, function as a form of statutory enforcement in addition to, or in conjunction with, enforcement by an administrative agency or other governmental entity." Esso Std. Oil Co. (Puerto Rico) v. Rodríguez-Pérez, 455 F.3d 1, 6 n.2 (1st Cir. 2006). 42 U.S.C. § 6972 enumerates the

requirements for a citizen suit under RCRA. It provides that, subject to certain restrictions, a private citizen may commence a civil action on his own behalf:

> (a)(1)(A) against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or
>
> (B) against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste <u>which may present an imminent and substantial endangerment to health or the environment</u>

(emphasis added). Thus, a suit pursuant to subsection (a)(1)(A) must be based on an ongoing violation, whereas a suit under (a)(1)(B) may be predicated on a past violation which presents an "imminent and substantial endangerment to health or the environment." <u>Id.</u>; <u>see</u> <u>also</u> <u>Meghrig</u> v. <u>KFC Western, Inc.</u>, 516 U.S. 479, 484 (1996). In either case, the Act empowers the district court to:

> enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A), to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, . . . and to apply any appropriate civil penalties . . . .

-10-

42 U.S.C. § 6972(a).

There are limitations on citizen suits under RCRA. First, citizen suits are subject to certain notice requirements. 42 U.S.C. § 6972(b)(1)(A) provides that a suit under (a)(1)(A) may not be commenced until sixty days after the putative plaintiff has notified the alleged violator and certain federal and state regulators; 6972(b)(2)(A) bars the commencement of citizen actions under (a)(1)(B) for ninety days after the proper parties have been notified. However, if the action alleges a violation of subchapter III of the statute (which deals with the management of hazardous waste specifically), the 60- and 90-day limits do not apply, and a citizen may file suit immediately after notification. 42 U.S.C. § 6972(b)(1)(A), (b)(2)(A). Finally, the statute also bars citizen suits if either the EPA administrator and/or the state in which the alleged contamination is located is already pursuing certain judicial or administrative actions to achieve compliance with federal regulations. See 42 U.S.C. § 6972(b)(1)(B), (b)(2)(B), and (b)(2)(C). We discuss several of the notice and preclusion provisions in greater detail below.

## III.

Esso raises a number of challenges to the district court's preliminary injunction order. As a threshold matter, Esso raises several arguments which, if accepted, would divest us of jurisdiction over this appeal. Esso first claims that plaintiffs'

section 6972 (a)(1)(A) and (a)(1)(B) claims are both barred by a civil action currently pending in the Southern District of New York (SDNY). That suit was brought by the Commonwealth of Puerto Rico against Esso and other defendants and includes claims under RCRA. Esso also alleges that the (a)(1)(B) claim is barred by RCRA's 90-day notice provision.

Plaintiffs dispute Esso's jurisdictional challenges to their suit. They claim that because benzene, which they characterize as a known contaminant at the service station, is a "hazardous substance," the ninety-day requirement of 42 U.S.C. § 6972(b)(2)(A) does not apply. Furthermore, they claim that the Commonwealth's action against Esso in the SDNY is not sufficiently comparable to preclude the filing of this case.

If we conclude that we do have jurisdiction over this appeal, Esso's most fundamental concern is not that it has been ordered to pay for the comprehensive site assessment, but rather its perception that its "liability has been summarily determined without discovery, without the benefit of a trial on the merits, and without the protection of a bond." Indeed, in its reply brief, Esso essentially admits that it likely would not have appealed if the injunction had been limited to ordering the comprehensive site assessment.

Pursuing this theme, Esso draws upon not only the language of the opinion and order itself, but also on the court's

comments in subsequent rulings, to support the contention that the court essentially resolved the liability issue against Esso in the guise of a preliminary injunction. Esso also argues that the injunction is defective because the court refused to make findings in support of each element of injunctive relief as required by Rule 65 of the Federal Rules of Civil Procedure.

Plaintiffs argue that the two-day hearing in the district court was adequate and provided a sufficient basis for the district court's order and injunction. Indeed, they argue on appeal, as they did in certain district court filings, that "[t]he record is clear that a trial on the merits was held." They characterize Esso's "allegation that a trial on the merits was not held and is not forthcoming" as "simply misleading." They add that "[a] hearing on the merits was conducted, the investigation of the contamination at the site has been completed. From the record in this case, it is clear that Esso's USTs originated the contamination. Therefore, injunctive relief is proper as issued."[3]

---

[3] In the alternative, plaintiffs contend that by presenting "undisputed" evidence of contamination and Esso's responsibility and failure to remediate, they established a likelihood of success on the merits. This is a direct response to Esso's brief, which argues that plaintiffs' failure to make the requisite showing of likelihood of success on the merits renders the injunction improper. However, because our disposition of this case prevents us from reaching the question of likelihood of success, we do not describe the parties' arguments on this topic.

## IV.

We first consider Esso's notice and preclusion arguments. Accepting either of them would divest us of jurisdiction. See, e.g., Garcia v. Cecos Int'l, Inc., 761 F.2d 76, 78-80 (1st Cir. 1985) (dismissing appeal from denial of injunction under RCRA for want of jurisdiction due to plaintiff's failure to comply with notice requirements); Rodríguez-Pérez, 455 F.3d at 5-6 (1st Cir. 2006)(analyzing question of whether RCRA citizen suit was precluded by administrative action as question of subject matter jurisdiction).

### A. Notice

On July 24, 2008, the plaintiffs notified Esso, the EPA, the EQB, and the state and federal Attorneys General, that they intended to file a lawsuit pursuant to 42 U.S.C. § 6972(a)(1)(A) and (a)(1)(B). Esso only challenges the adequacy of plaintiffs' notice with respect to its (a)(1)(B) claim. This is because 42 U.S.C. § 6972(b)(2)(A) prohibits the commencement of citizen actions under (a)(1)(B) until ninety days after the proper parties have been notified. By contrast, § 6972 (b)(1)(A) allows a claim under (a)(1)(A) to be filed sixty days after notice was given. Plaintiffs commenced suit on October 7, 2008, which was more than sixty but fewer than ninety days after the notice letter was sent. Accordingly, it is only our jurisdiction over the (a)(1)(B) claim that is implicated by this argument.

-14-

As a preliminary matter, we note that Esso did not present this notice argument to the district court in its opposition to plaintiffs' motion for preliminary injunctive relief. However, because it relates to subject matter jurisdiction, Esso's failure to present the notice argument to the district court is ultimately irrelevant, as we have an obligation to inquire into our own jurisdiction sua sponte. In re Olympic Mills Corp., 477 F.3d 1, 6 (1st Cir. 2007) (citing Doyle v. Huntress, Inc., 419 F.3d 3, 6 (1st Cir. 2005)).

In its injunction findings, the district court merely stated, without further explanation, that "[n]otice requirements have been met under 42 U.S.C. § 6972." Nor is it clear from the district court's opinion and order whether the injunction was issued pursuant to (a)(1)(A) (which would not implicate the notice issue), (a)(1)(B) (which would), or both. Nevertheless, that uncertainty ultimately does not matter, since we conclude that the plaintiffs complied with the notice requirements of RCRA in any event. The 90-day notice requirement does not apply if the citizen suit alleges a violation of subchapter III of the statute. 42 U.S.C. § (b)(2)(A). Here, plaintiffs' complaint specifically alleges that defendants improperly stored and disposed of hazardous waste "in violation of R.C.R.A. Subchapter III," and that these actions contributed to an imminent and substantial endangerment to health or the environment. Accordingly, plaintiffs were authorized

-15-

to file suit immediately after providing notice, and the fact that they did so before ninety days had elapsed does not divest us of jurisdiction over the (a)(1)(B) claim.

**B. The Diligent Prosecution Bar**

1. General Principles

Citizen suits under RCRA were meant to "supplement rather than to supplant governmental action." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 60 (1987). Accordingly, a citizen suit under either 42 U.S.C. § 6972(a)(1)(A) or (a)(1)(B) may be barred if a state or federal agency is diligently prosecuting an enforcement action against the same alleged violator, although the preclusion provisions for suits brought under (a)(1)(A) differ slightly from those applicable to (a)(1)(B) suits. Specifically, 42 U.S.C. § 6972(b)(1)(B) provides that a citizen suit under (a)(1)(A) is prohibited if a "State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States . . . to require compliance with [the] permit, standard, regulation, condition, requirement, prohibition, or order" that the citizen suit seeks to enforce. Similarly, no action may be commenced under (a)(1)(B) "if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment . . . (i) has commenced and is diligently prosecuting an action" under that subsection. 42 U.S.C.

-16-

§ 6972(b)(2)(C). Esso alleges that these statutory provisions, and a civil suit in the SDNY brought by the Commonwealth in which Esso is a defendant, divest the federal courts of jurisdiction over plaintiffs' suit.

We have never elaborated analytical principles for determining whether a civil action filed by a state under RCRA is sufficiently similar to a subsequent citizen suit so as to preclude it. Other courts, however, have confronted this or similar questions. Studying these precedents, one author has concluded that "most, but not all," of those courts have held that:

> For the government action to bar a citizen suit, the government action must seek "to require compliance with the standard, limitation, or order" . . . [that] the citizen alleges is violated . . . . On its face, a government action bars citizen suits only for violations they seek to enforce in common . . . [B]y specifying that the government action precludes a citizen suit only for the violations of the standard, limitation or order that they both allege and seek to abate, the provision implies that the government action does not preclude a citizen suit against other violations. That result is consistent with the policy of the provision; the notice and the delay period were intended to enable the government to have an opportunity to enforce against the violations of the standard, limitation or order alleged by the citizen, unencumbered by a citizen suit. Where the government has enforced against some, but not all of such violations alleged by the citizen, it has foregone its opportunity to foreclose the citizen from enforcing against the violations the government chose to ignore.

Jeffrey G. Miller, Theme and Variations in Statutory Preclusions Against Successive Environmental Enforcement Actions by EPA and Citizens: Part One: Statutory Bars in Citizen Suit Provisions, 28 Harv. Env. L. Rev. 401, 473-74 (2004) (footnotes omitted) (emphasis omitted).  We apply this insight here.

2. Esso's Claim

On June 12, 2007, the Commonwealth filed suit in the United States District Court for the District of Puerto Rico against various gasoline refiners and distributors, owners and operators of gasoline retail stations, and manufacturers of the gasoline additive methyl tertiary butyl ether (MTBE).  The complaint alleges large-scale MTBE contamination of the "waters of the Commonwealth," which it defines as "all Class SG1 ground waters and all Class SD surface waters located on the main island."  The Commonwealth asserts claims for: strict products liability for defective design and failure to warn; nuisance; trespass; negligence; violations of the Puerto Rico Public Policy Environmental Act, Water Pollution Control Act, and Underground Storage Tank Control Regulations; violations of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); violations of the Toxic Substances Control Act; and, finally, violations of RCRA.

The majority of the factual allegations in the complaint involve the defendants' liability for the use of MTBE as a gasoline

additive; indeed, the complaint notes that MTBE contamination was likely to result from "the normal and foreseeable storage, purchase, and use of gasoline within the Commonwealth." The Commonwealth avers that, in addition to producing gasoline containing MTBE, the defendants also knowingly promoted, marketed, and sold such gasoline in the Commonwealth despite their awareness that MTBE, a hazardous substance, would be released into the waters of the Commonwealth. The complaint seeks to recover damages to "fund the identification and treatment of MTBE contaminated waters used for public and private drinking water" and cover the costs of restoring those waters to their pre-discharge condition, as well as general "compensation for injuries to the waters of the Commonwealth." Additionally, the Commonwealth requests injunctive relief compelling defendants to investigate and remediate existing contamination and to prevent "further releases from their leaking underground storage tanks."

The Commonwealth's RCRA claim specifically alleges violations of Rule 1102(A) and (B) of the Puerto Rico USTCR on the part of the "Owner/Operator Defendants," which the complaint defines as those defendants who "owned or operated gasoline service stations and/or underground storage tanks that have discharged gasoline containing MTBE." The claim seeks an order "enforcing the Puerto Rico Underground Storage Tank regulations" that would compel defendants to "investigate and repair and/or properly close all

storage tanks . . . which are leaking or pose a significant risk of leaking to ensure they do not leak MTBE or MTBE-containing substances into the Commonwealth's soils, waters, and other natural resources," and to "investigate, delineate, and remediate all soils, waters, and other natural resources impacted by MTBE originating from leading [USTs] . . . so as to remove all detectable concentrations of MTBE."

On October 4, 2007, Esso was added as a defendant in the Commonwealth action. However, the complaint categorizes Esso as a "refiner/supplier" defendant; i.e., as a party that "refined, marketed, and/or otherwise supplied . . . gasoline and/or other products containing MTBE that [it] knew or should have known would be delivered into the Commonwealth." The Commonwealth does <u>not</u> allege that Esso is an owner or operator of a service station or UST.

The problem of MTBE contamination is not limited to the Commonwealth; indeed, the problem has a national scope:

> MTBE is at the center of hundreds of lawsuits involving standard toxic tort issues - product liability claims involving personal injury, nuisance and trespass actions alleging property devaluation, and putative class actions seeking medical monitoring and emotional distress. While defendants in these suits usually represent a small set of producers and distributors of MBTE, plaintiffs include states, municipalities, and individuals. Today, MTBE litigation is a cottage industry of its own, with a specialized bar and a small circle of experts.

Douglas A. Henderson & Mary K. McLemore, MTBE: A Tale of Air, Water, and Civil Procedure, 19 Nat. Resources & Env't. 20, 20 (2004-2005). Because MTBE litigation is so prevalent, the Judicial Panel on Multidistrict Litigation has transferred a large number of actions raising similar allegations to the Southern District of New York for coordinated or consolidated pretrial proceedings. See 28 U.S.C. § 1407 (permitting transfer where "civil actions involving one or more common questions of fact are pending in different ditricts"). Judge Shira A. Scheindlin has now presided over MTBE cases for nearly a decade. On October 31, 2007, the Panel transferred the Commonwealth action to her court in the Southern District of New York; the transfer order indicated that it was the 152nd case to be so transferred.

While Esso is correct that there may be some overlap between the Commonwealth's suit and the case at bar, we find this overlap insufficient to divest us of jurisdiction over this case. First, comparing the RCRA claims only, the two complaints involve different contaminants (MTBE as opposed to benzene and other petroleum-related hydrocarbons), a distinction which other cases have found significant. See, e.g., A-C Reorganization Trust v. E.I. DuPont de Nemours & Co., 968 F. Supp. 423, 431-32 (E.D. Wisc. 1997)(holding that a consent order issued by the EPA did not preclude a citizen suit under RCRA where that consent order 1) did not necessarily contemplate the remediation of potential

-21-

groundwater contamination, as opposed to surface contamination; and 2) did not address contaminants other than arsenic, whereas the citizen suit alleged the presence of other contaminants); Frilling v. Village of Anna, 924 F. Supp. 821, 837-39 (S.D. Ohio 1996) (allowing citizen suit under Clean Water Act (CWA) to proceed where Consent Order entered in state civil enforcement action sought to require compliance with federal parameters for only two of the six pollutants which citizen plaintiffs alleged had exceeded allowable levels); see also Maryland Waste Coal. v. SCM Corporation, 616 F. Supp. 1474, 1484 (D. Md. 1985).

Moreover, in its complaint in the SDNY, the Commonwealth even explains that "the fate and transport of MTBE in the subsurface differs significantly from that of gasoline constituents that have historically been of environmental and/or toxicological concern, specifically the 'BTEX compounds' (benzene, toluene, ethylbenzene, and xylene)," compounds which are the subject of plaintiffs' complaint. This difference means that, even though both compounds are components of gasoline, the areas affected by MTBE and BTEX contamination could potentially be different and/or require different remedial measures in case of a leak from a UST. Additionally, it is not evident from the face of the Commonwealth's complaint that MTBE is a common diesel additive, whereas some of the allegations in the case at bar involve contamination resulting from an allegedly leaking diesel tank.

The two complaints also allege distinct violations of Puerto Rico's USTCR. The complaint in this action alleges violations of Rules 501, 503, 601, 602 (A), (B), 603(A), 604 (A), (C), and 606(A)(1)(3). In contrast, the Commonwealth accuses "all defendants with regulated facilities in the Commonwealth" of violating Rule 1102(A), (B), and (D). Aside from the difference in the specific rules that the two complaints seek to enforce, the Commonwealth's RCRA action expressly implicates Esso in a different capacity than the instant action. The MTBE litigation names Esso as a "refiner/supplier" defendant that "refined, marketed, and/or otherwise supplied . . . gasoline and/or other products containing MTBE that each such Defendant knew or should have known would be delivered into the Commonwealth." The Commonwealth does <u>not</u> allege that Esso is one of the "Owner/Operator Defendants" whose alleged unlawful releases of MTBE-containing substances and failure to take appropriate precautions to prevent and/or control releases violated the UST Regulations. In this citizen suit, by contrast, Esso is named as the owner/operator of the USTs and alleged to be directly responsible for the contamination emanating from them.

Furthermore, there is a question of scope. The Commonwealth's suit is intended to protect the "waters of the Commonwealth" generally, and seeks significant compensation for damage that MTBE has inflicted upon those waters. In this case, we are dealing with the potential contamination and clean-up of one

-23-

particular property, which may or may not be affected by MTBE contamination. In our view, a suit against dozens of defendants seeking to remedy the harm caused throughout the Commonwealth by one contaminant is notably different than an action asking one particular defendant to clean up a number of different contaminants on a single private property.

Finally, we are not persuaded by Esso's reference to potentially overlapping remedial obligations. Esso argues that plaintiffs' suit is barred in part because the abatement of the MTBE contamination alleged in the Commonwealth action would "necessarily abate other gasoline constituents leaked into the same soil or groundwater." However, it is not apparent from the pleadings in the two cases that the remedial measures for the various types of contamination are consistent; indeed, the SDNY complaint specifically alleges a difference in the nature of MTBE pollution and the pollution of other gasoline constituents.

If, however, the remedy is identical, then whichever action is resolved first will obviate the need for the performance of that remedy in the other action. Given the magnitude of the MTBE litigation, it is almost certain that this case, which concerns only one site and is proceeding on an expedited basis, will reach the remedy stage first, perhaps even before the massive discovery is completed in the MDL. Any potential clean-up that the court may require in this case will either 1) remove the gasoline

-24-

contamination generally from the affected site, and therefore any MTBE that it may have contained, or 2) remove or remediate only the pollutants at issue in this litigation. In the first case, the Dolores Service Station will simply be one less site for Esso to remediate in the MTBE litigation; in the second, it will need to do the same kind of remediation with respect to the MTBE that it would have in the absence of this citizen suit. Therefore, the Commonwealth's continued prosecution of the SDNY action would not represent a waste of enforcement resources or a duplication of efforts, which is what Congress was trying to avoid with the preclusion provisions. Alternatively, in the event that the remedies somehow conflict, the parties are free to seek modification of the relevant injunction; there is no need, at this stage, to "short circuit" this suit on jurisdictional grounds. See, e.g., Me. People's Alliance v. Holtrachem Mfg. Co., LLC, No. CIV-00-69-B-C, 2001 WL 1602046, at * 8 (D. Me. Dec. 14, 2001) (Kravchuk, Mag. J.) (noting, in the context of a primary jurisdiction analysis, that "on the state of the current record," the potential conflict between a regulatory decree and eventual court-ordered remediation was "not so inherent and tangible so as to justify short circuiting this congressionally authorized citizen suit on primary jurisdiction grounds" because, "when and if this

Court and the parties arrive[d] at a remedy phase, the conflict concern [could] be revisited").[4]

**V.**

**A. Standard of Review and Preliminary Injunction Law**

We review the grant of a motion for a preliminary injunction for abuse of discretion. Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008). More specifically, we review findings of fact for clear error and conclusions of law de novo. Id. We will set aside a district court's ruling as to preliminary injunctive relief "if the court clearly erred in assessing the facts, misapprehended the applicable legal principles, or otherwise is shown to have abused its discretion," Wine and Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005), bearing in mind that, in general, trial courts have wide discretion in making judgments regarding the appropriateness of such relief. Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 158 (1st Cir. 2004). An error of law is always an abuse of discretion. Id.

A preliminary injunction "is traditionally viewed as relief of an extraordinary nature and does not purport to be a

_____

[4] In their brief, plaintiffs raise an alternative argument for why the SDNY action does not preclude this citizen suit. They contend that, because the Commonwealth's pre-litigation notice in the SDNY litigation fails to allege a RCRA violation, that claim is improperly asserted and therefore may not preclude this suit. In light of our holding above, we need not reach this argument.

-26-

disposition of the matter on its merits." United States v. School Dist. of Omaha, 367 F. Supp. 179, 193 (D. Neb. 1973); see also Benson Hotel Corp. v. Woods, 168 F.2d 694, 696 (8th Cir. 1948) ("The application for [a preliminary] injunction does not involve a final determination on the merits; in fact, [its] purpose . . . is not to determine any controverted right, but to prevent a threatened wrong or any further perpetration of injury . . .[,] and thus to protect property or rights . . . until the issues can be determined after a full hearing."). Accordingly, in determining whether to grant a preliminary injunction, the district court must consider the following factors:

> first, the likelihood that the party requesting the injunction will succeed on the merits; second, the potential for irreparable harm if the injunction is denied; third, the hardship to the nonmovant if enjoined compared to the hardship to the movant if injunctive relief is denied; and fourth, the effect of the court's ruling on the public interest.

Water Keeper Alliance v. U.S. Dept. of Defense, 271 F.3d 21, 30 (1st Cir. 2001) (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)).

A court granting a preliminary injunction must set forth the findings of fact and conclusions of law supporting its issuance. Fed. R. Civ. P. 52(a)(2). We have vacated preliminary injunctions that fail to include such findings. See, e.g., TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir. 1996) (vacating injunction for failure to comply with this

requirement and noting that on remand "the district court w[ould] have to apply the four-part preliminary injunction test and set forth the basis for its ruling on each prong"). Furthermore, Rule 65(d)(1) of the Federal Rules of Civil Procedure requires that every injunction order: "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). "[T]he federal courts have been very careful to give [Federal Rule 65(d)] full effect. [Its] requirements . . . have been treated as mandatory, and even emergency conditions have not warranted a departure from them." 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2955 (2009). An order that fails to comply with the prerequisites of Rule 65(d) should be set aside on appeal. Id.

Rule 65(a)(2) also provides a procedural mechanism for consolidating a preliminary injunction hearing with the trial on the merits. See Fed. R. Civ. P. 65(a)(2). However, the real "hazards inherent in fully disposing of cases in such an expedited fashion - among them incomplete coverage of relevant issues and failure to present all relevant evidence," have led courts to demand "indisputably clear notice" to the parties before approving such consolidation. Caribbean Produce Exch., Inc. v. Sec'y of Health & Human Servs., 893 F.2d 3, 5 (1st Cir. 1989) (reversing the

final disposition of the case on the merits after preliminary injunction hearing because district court had failed to notify the parties of its intent to do so and therefore they had been "operat[ing] on the assumption that only the preliminary injunction was at stake"); see also 11A Wright, Miller, & Kane, Federal Practice and Procedure § 2950 (2009) ("[O]rdering consolidation during the course of a preliminary injunction hearing is reversible error when little or no notice is given of this change and the effect is to deprive a party of the right to present his case on the merits.").

When a trial court "disposes of a case on the merits after a preliminary-injunction hearing without expressly ordering consolidation . . . it is likely that one or more of the parties will not present their entire case at an unconsolidated preliminary-injunction hearing." Id. Therefore, it is ordinarily improper to decide a case solely on such a basis. As the Second Circuit wrote:

> The judge's legal conclusions, like his fact-findings, are subject to change after a full hearing and the opportunity for more mature deliberation. For a preliminary injunction - as indicated by the numerous more or less synonymous adjectives used to label it - is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its as-for-the-time-beingness. It serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as

-29-

> possible in the respective positions they occupied when the suit began.

*Hamilton Watch Co.* v. *Benrus Watch Co.*, 206 F.2d 738, 742 (2d Cir. 1952) (Frank, J.) Consequently, it is inappropriate for the court, at or after a preliminary injunction hearing, to "make findings of fact or conclusions of law that go beyond what is necessary to decide whether a preliminary injunction should be issued." 11A Wright, Miller, & Kane, *Federal Practice and Procedure* § 2950.[5]

## B. Analysis of the District Court Proceedings

The district court here was not mindful of the limitations of a preliminary injunction proceeding. A review of the record reveals that the district court impermissibly prejudged the merits of the case at the preliminary injunction stage and, having reached a conclusion as to liability, determined that it was unnecessary to do the full preliminary injunction analysis. This conclusion flows inevitably from the district court's explanation of its preliminary injunction order and its statements in the post-injunction proceedings.

---

[5] *See also* *Indus. Bank of Wash.* v. *Tobriner*, 405 F.2d 1321, 1323-24 (D.C. Cir. 1968) (holding that to the extent that the findings and conclusions of the district court "purported to settle finally the questions of law and fact raised by the complaint, those findings and conclusions went beyond the determination the judge was called upon to make" in a preliminary injunction proceeding, and therefore would not be regarded as binding in further proceedings).

1. The Injunction Opinion and Order

The court began by reciting a number of factual findings. It found that Esso had, until October of 2008, "operated" the service station[6] and owned one diesel and two gasoline USTs, as well as related pumps, pipelines, and servicing equipment, on the property. In 1992, Esso replaced the existing steel diesel UST with a fiberglass tank, as it did for the two steel gasoline tanks in 1998. In connection with the 1998 replacement of the gasoline USTs, Esso also removed some of the soil surrounding the tanks. The district court expressed concern that lead contamination had potentially occurred during this 1998 tank replacement, finding that the steel tanks had held leaded gasoline for many years before unleaded gasoline became available in 1988. The court stated that Esso's excavation and disposition of the soil and its failure to acknowledge the possibility that the soil was contaminated reflected "willful blindness" indicative of a potential RCRA violation.

Besides the potential for lead contamination, the district court also found that "the service station facility and equipment discharged hazardous petroleum-related products and discarded hazardous waste and related contaminants" into the

---

[6] This seems to be an error on the part of the district court. While Esso supplied the station's petroleum-related products and was a <u>UST</u> operator for the purposes of the applicable environmental regulations, it is undisputed that the Sánchez family, and not Esso, was the <u>service station</u> operator.

-31-

surrounding soils and groundwater.  The court concluded that Esso had known about the contamination since at least 1993.[7]

The court then observed that in November 2001, Esso hired Environmental Resource Technologies (ERTEC) to perform a subsoils evaluation of the site, the results of which became available in November 2003.  The report found levels of Total Petroleum Hydrocarbon (TPH) of 3,290 mg/kg in the soil above the groundwater surrounding the diesel tank, which exceeded the acceptable 100 mg/kg limit set by EQB.  The report further recommended that the diesel tank and pipeline be tested in accordance with EQB regulations, a test which, the court found, was never performed.

In September 2006, Esso again hired ERTEC, this time to perform an assessment known as a Phase II Environmental Evaluation. The ensuing report indicated that the groundwater below the service station was contaminated with benzene,[8] a hazardous petroleum-

---

[7] To support this conclusion, the court cites, but does not discuss "Plaintiffs' Exhibit One."  Exhibit One, introduced at the injunction hearing, is the report of plaintiffs' expert, Carlos Belgodere.  The report states that "The soils and groundwater monitoring data . . . indicate that Esso knew of soil and groundwater contamination below the facility UST's [sic] as early as April 23, 1993."  This conclusion, in turn, appears to be based on a table in a report that was created for Esso during the 1998 tank change process.  The table contains monthly data from three monitoring wells that Esso had installed on the property in 1993. Neither the expert report, nor the court's opinion, explains how these figures demonstrate Esso's knowledge of contamination, or the kind of contamination involved.

[8] The court's actual finding with respect to benzene was expressed in the present tense.  It stated that the Phase II evaluation "revealed that the groundwater below the Esso Dolores Service Station is contaminated with the gasoline constituent

-32-

related hydrocarbon which is heavily regulated by the EPA due to its known carcinogenic properties.[9] The court noted that, although federal regulations establish a Maximum Contaminant Level (MCL) for benzene of 5 mg/l in groundwater and .5 mg/l in drinking water, the Phase II report revealed concentrations as high as 2,800 mg/l. The report concluded that the contamination was "apparently related" to discharges emanating from the southeast area of the site, where the USTs are located, and the northeast area, which contains the grease traps.

According to the district court, a review of the EQB UST Program File for the Dolores Service Station confirmed that Esso had never reported the contamination documented in the Phase II report to the EQB, and this "non-reporting" likely explained why the station was not listed in the EQB's Leaking Underground Storage Tank facility list. The court determined that Esso had never conducted the tests required to investigate the extent of the petroleum-related contamination or performed an "organic lead analysis" on the property. For this reason, the court concluded that Esso had "distanced itself from its duty to confront the contaminated status of the property and ha[d] only taken bland

benzene" (emphasis added).

[9] See, e.g., Safe Drinking Water Act, 42 U.S.C. §§ 300f - 300j-26; United States Environmental Protection Agency, "Consumer Factsheet on: Benzene," http://www.epa.gov/ogwdw/contaminants/dw_contamfs/benzene.html (last visited June 10, 2009).

mitigation measures, without committing itself to removing the contamination as required."  In sum, the court stated that Esso "appear[ed] to be in continuous violation[]" of EQB rules and their federal counterparts, and that Esso's "derelict" conduct bordered on "egregious," reflecting a goal to "hopefully duck legal responsibility or have others, such as the Plaintiffs or another incoming petroleum company, deal with the problem generated by Esso's actions."  It noted that the "costs associated with pre-cleanup studies and actual cleanup can reach astronomical monetary figures, and Esso must bear responsibility as required by law."  After making these factual and legal findings, the district court explicitly stated that it saw "no need to make a boilerplate exposition of irreparable harm and injunction law, because it is patently clear that this case fit[] the most restrictive measure for that remedy."

The actual order itself directed the parties to submit recommendations for companies that could perform a comprehensive site assessment "before the court further orders Esso to remediate soil and groundwater contamination at the site originating from . . . petroleum-based products dispensed" at the service station between 1982 and October 31, 2008.[10]  The court then

_____

[10] The court noted that ERTEC, Esso's contractor, might be disqualified from performing such an assessment.  No party has challenged on appeal the district court's disqualification of ERTEC, and we take no position on the matter, leaving it to the district court's discretion.

scheduled a hearing to "consider the implementation" of the comprehensive site assessment "at Esso's expense." The order concluded by declaring:

> In addition, and subject to the results of the scheduled . . . hearing, Esso is not only enjoined and restrained from contributing by action or inaction to further environmental contamination at the site, but Esso will be ordered, depending on the results of the Comprehensive Site Assessment, to pay for all necessary testing, corrective actions, and removal of all pollution and contamination within the site and into adjacent areas as previously described.

2. Post-Injunction Proceedings

On December 19, 2008, Esso moved for reconsideration of the preliminary injunction order pursuant to Fed. R. Civ. P. 59, asking the court to modify certain factual findings, including the determination that Esso would be responsible for paying for all of the necessary testing, corrective actions, and removal of contamination within and adjacent to the site. Three days later, at a hearing on December 22, 2008, the court denied Esso's motion for reconsideration without explanation.

Also at the December 22 hearing, the district court selected a site assessment team made up of court-approved experts from both sides and ordered that the bills for the work performed be submitted to the court for payment by Esso. Carlos Alvarez, an expert hired by plaintiffs to assist with the site assessment, estimated that the assessment would cost between $50,000 and

$75,000, which was consistent with the $75,000 estimate offered by Jose Hernandez, Esso's expert. The court entered a scheduling order indicating that it would meet with counsel and the experts to discuss the comprehensive site assessment on January 15, 2009.

On January 14, 2009, the day before the first status conference, Esso asked the court to require plaintiffs, pursuant to Fed. R. Civ. P. 65(c), to post a bond in the amount of $75,000 to cover the anticipated cost of the site assessment. In a written opinion denying the motion issued the next day, the court characterized Esso's request as predicated upon "the fact that the court has ordered Esso to pay for the comprehensive site assessment that will let . . . the court know the extent of the documented environmental damage caused by Esso's use of the [station] for the sale of gasoline and petroleum-based products for a good number of years." (Emphasis added.) The court stated that it would "dispense with security altogether, because the grant of the preliminary injunction carrie[d] no risk of monetary loss" for Esso in the face of the "documented" contamination resulting from Esso's "violation of regulatory safeguards designed to prevent environmental contamination and pollution that adversely affect[ed] not only Plaintiff, but the general public." The only issue, the court stated, "was the extent of the contamination and the extent of measures to be taken to remedy the situation." Because Esso was liable "as a matter of law for any contamination and environmental

damage resulting while it had the service station under its direct supervision and control," the court perceived no risk of monetary loss to Esso that would necessitate the posting of a bond: "the only issue seem[ed] to be the extent of the liability." Indeed, the court characterized Esso's expenditures associated with "the court's effort to fairly determine the extent of Esso's liability" (i.e., the site assessment) as "de minimis," and stated that they paled in comparison to the public interest in remediating damage to the environment.

The district court also denied, on similar grounds, Esso's January 30, 2009 request to stay enforcement of the preliminary injunction pending this interlocutory appeal. The court repeated its conclusion that Esso had violated federal environmental regulations, listing six actions that Esso had "failed" to take in contravention of those regulations. Finally, the court noted that Esso had "participated fully in proceedings to fashion interim measures," (presumably a reference to the comprehensive site assessment). It thus found the stay motion "to be a belated delay tactic employed in bad faith."

3. Analysis

We acknowledge that the district court used some qualifying language in its various opinions. It occasionally described Esso's conduct as "apparent" violations, stated that the injunction hearing had yielded a "limited" record, and

characterized the nature of the relief it awarded as "preliminary." Additionally, as we have mentioned, in response to our ruling on Esso's emergency Motion to Stay, the district court issued a Notice stating that it was never its intention "to require Defendant to undertake any remedial measures in advance of the preparation of a remedial plan, except as may become necessary to remedy any emergent threat to human health or safety." Nevertheless, the court failed to amend the injunction order itself, which remained intact, and the court's nominal references to the preliminary nature of the proceedings do not undermine the overwhelming impression, conveyed by the portions of the record quoted above, that the court has already conclusively resolved the liability issue against Esso. The result was a "de facto" consolidation, without notice, which we cannot condone. See, e.g., T.M.T. Trailer Ferry, Inc. v. Union de Tronquistas de P. R., Local 901, 453 F.2d 1171, 1172 (1st Cir. 1971)(even where there was "no indication that [a party] would have produced further testimony if notified earlier that the entire case would be disposed of" after the preliminary injunction hearing, this did not "sanction the court in changing, sub silentio, the nature of the game at halftime").

The evidence of the court's conclusive determination of liability is inescapable. In addition to the language used in its findings and the order itself, the district court explicitly refused to consider the other factors of the preliminary injunction

analysis, stating that it saw "no need to make a boilerplate exposition of irreparable harm and injunction law" because it was "patently clear" that injunctive relief was warranted in this case. The district court's refusal to address these other factors, in contravention of the requirements of Rule 65(d)(1), was a clear error of law.  This refusal also confirmed that the court had already decided that the plaintiffs had prevailed on the merits, not merely that they were "likely" to do so.

That same conclusive determination of liability pervades the court's denial of Esso's request for a bond:

> The comprehensive site assessment that has been ordered is the only way in which the court will be able to determine the extent of Esso's liability, and the cost of such studies cannot serve as a basis for a claim of probable loss or monetary loss to Esso.  No material damage to Esso will result from this litigation, where the only issue seems to be the extent of the liability.

Here again the court announces that Esso's liability for the pollution at issue, whatever its scale, has been decided in the preliminary injunction proceedings.

As we have described, the purpose of a preliminary injunction is to preserve the status quo <u>before</u> the merits have been resolved.  Certainly, the traditional four-part inquiry requires that a court make some assessment of the plaintiffs' likelihood of success on the merits.  But these assessments should only aid the court in deciding whether some type of interim relief

is necessary. Ultimate findings of liability "should be made only after all parties have had ample opportunity to employ the liberal discovery processes offered by the Federal Rules and to otherwise prepare the matter in detail for presentation to [the] Court in a manner conducive to sound and deliberate legal determination." School Dist. of Omaha, 367 F. Supp. at 194; Benson Hotel Corp., 168 F.2d at 698. Despite plaintiffs' representations to the contrary, Esso has not yet had that opportunity. Because the court's ultimate findings of liability were made before Esso had the benefit of the process which it was due,[11] the injunction, as issued, cannot stand.[12]

---

[11] See, e.g., H & W Indus., Inc. v. Formosa Plastics Corp., USA, 860 F.2d 172, 178-79 (5th Cir. 1988) (holding that district court abused its discretion by denying a preliminary injunction "based upon its ruling on the underlying merits of the case" and thereby rendering a sua sponte summary judgment; instead, "grant or denial of a preliminary injunction must be the product of a reasoned application of the four factors held to be necessary prerequisites"); Progress Dev. Corp. v. Mitchell, 286 F.2d 222, 233 (7th Cir. 1961) (rejecting defendants' argument that summary judgment was appropriate at preliminary injunction stage because "lengthy hearings and extensive record demonstrate[d] that a full hearing . . . was held" and finding error in district court's decision to "pass on the merits of the case on the basis of a preliminary hearing on a motion for temporary injunction").

[12] Although we have decided to vacate portions of the preliminary injunction order, we note that any admissible evidence that the district court received on the preliminary injunction motion has already become a part of the trial record and need not be repeated at trial. See Fed. R. Civ. P. 65(a)(2).

**VI.**

Although we conclude that the preliminary injunction order is defective for the reasons enumerated above, we find one aspect of the injunction -- ordering the comprehensive site assessment -- to be both proper and commendable.

We have stated that RCRA is a "cradle-to-grave statute providing a full range of remedies designed to protect both health and the environment." United States v. Borowski, 977 F.2d 27, 31 (1st Cir. 1992). RCRA's citizen suit provision expressly grants district courts broad equitable powers "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both." 42 U.S.C. § 6972(a).[13] Congress "intended that the injunctive provision have a rather broad scope." Comite Pro Rescate de la Salud v. P.R. Aqueduct and Sewer Auth., 888 F.2d 180, 185 (1st Cir. 1989).[14]

---

[13] Of course, the district court also has the power to enforce any permit, standard, regulation, condition, requirement, prohibition, or order referred to in subsection (a)(1)(A), and the plaintiffs may continue to seek such enforcement.

[14] See also Subcommittee on Oversight and Investigation of The H. Comm. on Interstate and Foreign Commerce, 96th Cong, Report on Hazardous Waste Disposal 32 (Comm. Print 1979)(noting that this provision was intended to confer "overriding authority to respond to situations involving a substantial endangerment to health or the environment").

This broad scope means that a private citizen may seek "a mandatory injunction, i.e., one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that 'restrains' a responsible party from further violating RCRA." Meghrig, 516 U.S. at 484. This broad scope includes mandatory preliminary injunctions. Even though preliminary injunctive relief is typically intended to preserve the status quo, the status quo in cases of potential environmental contamination is not a "condition of rest," but one "of action which, if allowed to continue or proceed unchecked and unrestrained, will inflict serious irreparable injury." United States v. Price, 688 F.2d 204, 212 (3d Cir. 1982) (quotation marks and citation omitted). Thus, the fact that "an injunction may require the payment or expenditure of money" does not foreclose the possibility of equitable relief; "[t]he funding of a diagnostic study . . ., though it would require monetary payments, would be preventive rather than compensatory." Id. Accordingly, the Third Circuit in Price recognized that a district court, in appropriate circumstances, would have the authority to order a diagnostic environmental study, funded by the defendant, in the context of preliminary injunctive relief. Other courts have agreed. See, e.g., Bayless Inv. & Trading Co. v. Chevron USA, Inc., No. 93C704, 1994 WL 1841850, at *4-5, (D. Ariz.

May 25, 1994); <u>Lincoln Props., LTD</u> v. <u>Higgins</u>, No. S-91-760DFL/GGH 1993 WL 217429, at *16 (E.D. Cal. Jan. 21, 1993).

As a result of the court order in this case, there has already been extensive testing of the soil and groundwater surrounding the Dolores Service Station. Almost immediately after issuing the injunction, the district court selected a team of experts approved by the litigants to conduct an exhaustive analysis that would determine the nature and extent of any contamination in the area. According to a report filed in the district court on May 17, 2009, and consistent with the parties' representations at oral argument, extensive sampling data has already been provided to approved chemists for analysis, validation, and certification. Final sampling was scheduled to take place in the second half of May, and the parties are working on a final report for the court. The results of this study will benefit not only the parties and the court as this litigation proceeds, but also the public. Indeed, Esso itself is candid in its reply brief that "if the court-ordered study were really the extent of the court's injunction, this would be a different, and probably nonexistent, appeal." Counsel for Esso expressed a similar sentiment at oral argument.

We applaud the court for taking this sensible step. We understand the court's legitimate concerns about the possibility of extensive environmental contamination and its health effects. <u>See</u> <u>Amoco Prod. Co.</u> v. <u>Village of Gambell</u>, 480 U.S. 531, 545 (1987)

("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.") We also recognize the integral role of our district courts in enforcing comprehensive federal and state environmental statutes. See Me. People's Alliance and Natural Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 296 (1st Cir. 2006). We do not lightly vacate a preliminary injunction issued by a district court when the public interest in the relief sought is so substantial. But not even the expansive equitable powers of the courts to remediate environmental harm can excuse the district court's premature determination of the merits of the plaintiffs' claims against Esso.

Accordingly, we must vacate provision 5 of the preliminary injunction order of the district court because it reflects an improper adjudication of the merits of the dispute.[15] However, we affirm the district court's decision as to provisions 1 through 4 on page 9 of the district court order. The first three provisions pertain to the administration of the comprehensive site assessment. The fourth provision relates to notice to the EQB and the EPA.

---

[15] See, e.g., Otis Elevator Co. v. Int'l Union of Elevator Constructors, Local 4, 408 F.3d 1, 10 (1st Cir. 2005) (affirming only one aspect of preliminary injunction order and vacating the remainder); Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 274 (1st Cir. 1981) (same).

Because we are affirming the portion of the order that requires Esso to pay money, and because the district court's prior decision to deny Esso's request for a bond was based on its premature adjudication of liability, we also instruct the district court to reconsider Esso's request for a bond based on the requirements of Federal Rule 65(c).[16] Once the district court has received the results of the environmental analysis of the site, it should address the merits of plaintiffs' case, subject to the applicable rules of discovery. We express no position on how that matter should ultimately be resolved. We also wish to make clear that nothing in this opinion forecloses the district court's ability to order further preliminary injunctive relief, such as further testing, or remediation of conditions that imminently threaten public health and safety, so long as any such relief is consistent with this opinion, the Rules of Civil Procedure, and our case law.

---

[16] See Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added)); 11A Wright, Miller, & Kane, Federal Practice & Procedure, § 2954 (2d ed. 2009) ("[Rule 65(c)] is phrased in mandatory terms and the conclusion seems inescapable that once the court decides to grant equitable relief under Rule 65 it must require security from the applicant . . . In fact, . . . a district court's failure to require the posting of a bond or other security has been held reversible error." (footnotes omitted).

**Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion**. Each party shall bear its own costs.