# United States Court of Appeals
## For the First Circuit

No. 19-2095

THE BLACKSTONE HEADWATERS COALITION, INC.,

Plaintiff, Appellant,

v.

GALLO BUILDERS, INC.; ARBORETUM VILLAGE, LLC;
STEVEN A. GALLO; and ROBERT H. GALLO,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

---

Before

Howard, Chief Judge,
Barron, Circuit Judge,
and Katzmann, Judge.[*]

---

James P. Vander Salm, with whom Law Office of James P. Vander
Salm was on brief, for appellant.
William D. Jalkut, with whom Fletcher Tilton P.C. was on
brief, for appellees.

---

April 26, 2021

---

    [*] Of the United States Court of International Trade, sitting
by designation.

BARRON, **Circuit Judge**.   In May 2016, the Blackstone Headwaters Coalition, Inc. ("Blackstone"), a non-profit environmental organization, sued four defendants (two companies, Gallo Builders, Inc. ("Gallo Builders") and Arboretum Village, LLC ("Arboretum Village"); and two individuals, Steven Gallo and Robert Gallo) involved in the development of a residential construction site in Worcester, Massachusetts.  Blackstone brought the suit in the District of Massachusetts pursuant to the citizen suit provision of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a), which is better known as the Federal Clean Water Act, 33 U.S.C. § 1251 et seq. ("the Federal CWA").

The suit alleged in Count I of Blackstone's complaint that Gallo Builders, Steven Gallo, and Robert Gallo had violated the Federal CWA based on a failure by Gallo Builders to obtain from the U.S. Environmental Protection Agency ("EPA") what is known as a Construction General Permit, which the Federal CWA and certain of its implementing regulations allegedly required that company to have due to its connection to the work that was being done at the construction site in Worcester.  See 33 U.S.C. § 1342; 40 C.F.R. §§ 122.26(b)(14)(x), 122.28; 2012 National Pollutant Discharge Elimination System General Permit for Discharges from Construction

- 2 -

Activities § 1.1.a ("Construction General Permit").[1] The suit alleged in Count II of Blackstone's complaint that all four defendants -- Gallo Builders, Arboretum Village, Robert Gallo, and Steven Gallo -- had violated the Federal CWA and certain of its implementing regulations by failing to prevent sediment-laden stormwater discharges from flowing from that construction site into waters that lead to the Blackstone River.

The District Court granted summary judgment in the defendants' favor as to the first of these two claims. The District Court ruled that, because Arboretum Village had the requisite Construction General Permit, Gallo Builders, Steven Gallo, and Robert Gallo had committed at most a "technical violation" of the Federal CWA and its implementing regulations in failing to secure such a permit for Gallo Builders and that a violation of that kind was not itself actionable via the Federal CWA's citizen suit provision.

The District Court also granted summary judgment to the defendants on Blackstone's other claim, which was set forth in Count II of the complaint. The District Court based this ruling on section 309(g)(6)(A)(ii) of the Federal CWA, codified at 33 U.S.C. § 1319(g)(6)(A)(ii). That provision of the Federal CWA

---

[1] Available at https://www.epa.gov/sites/production/files/2016-09/documents/cgp2012_finalpermitpart1-9-updatedurl.pdf.

bars an otherwise permissible citizen suit under that same statute from going forward if a state government has already commenced and is diligently prosecuting a sufficiently related enforcement action under a law comparable to section 309(g) of the Federal CWA. See id.

The District Court concluded that this preclusion bar in the Federal CWA applied here because of a prior enforcement action that the Massachusetts Department of Environmental Protection ("the MassDEP") had brought against Arboretum Village based on alleged sediment-laden stormwater discharges at the construction site. In that same order, the District Court also denied Blackstone's cross-motion for summary judgment, in which Blackstone had sought a ruling that, as a matter of law, the MassDEP's prior enforcement action against Arboretum Village did not trigger the statutory preclusion bar in the case that Blackstone was bringing.

Blackstone now appeals from these rulings. We affirm in part and reverse in part.[2]

**I.**

The following facts are not in dispute. Since approximately 2006, the four defendants -- Gallo Builders, Arboretum Village, Steven Gallo, and Robert Gallo -- have been

---

[2] We acknowledge with appreciation the assistance of the amici curiae in this case.

collectively involved in constructing a large residential development known as Arboretum Village Estates at a site in Worcester, Massachusetts. In June 2013, an analyst for the MassDEP who was monitoring the site for compliance with Massachusetts state environmental laws reported having observed "[d]ischarge(s) of silt-laden runoff (measured from 200-645 Nephelometric Turbidity Units ('NTUs'))[3] from unstable, eroded suspended soils at the Site to an unnamed, perennial stream . . . [that feeds into] the Blackstone River." The MassDEP thereafter issued what is known as a Unilateral Administrative Order ("UAO"), which named Arboretum Village as respondent on June 21, 2013; identified various violations that it had committed at the site; threatened to impose civil penalties on the company; and ordered that it undertake a number of remedial actions.[4]

Construction at the site came to a halt in the wake of the UAO. Arboretum Village thereafter administratively appealed the UAO to the MassDEP's Office of Appeals and Dispute Resolution.

In late 2014, with the administrative appeal of the UAO pending, the MassDEP and Arboretum Village executed a settlement in the form of an Administrative Consent Order with Penalty

---

[3] NTUs are a measure of water turbidity taken with an instrument that gauges the reflectivity of light off water.

[4] While the UAO named Arboretum Village as respondent, it was mailed to Steven Gallo in his capacity as President of Arboretum Village.

("ACOP"). The MassDEP's Commissioner approved the ACOP in a Final Decision on December 22, 2014. The Final Decision explained that, under the ACOP, Arboretum Village would be required, among other things, to "pay an $8,000.00 civil administrative penalty to the Commonwealth," to undertake certain remedial measures at the site, and to agree to "pay stipulated penalties and/or be subject to additional high level enforcement action from the [MassDEP] if any further discharges of turbid stormwater runoff to wetlands resource areas in excess of 150 NTUs occur."

More than a year later, on May 6, 2016, Blackstone filed this suit in the District of Massachusetts under the citizen suit provision of the Federal CWA. See 33 U.S.C. § 1365(a). Blackstone's "mission is to restore and protect water quality and wildlife habitat in the Blackstone River . . . and its tributaries." Its members use and enjoy the Blackstone River and adjacent waters "for recreation, sightseeing, wildlife observation, and other activities," and it claims to "have a recreational, aesthetic, historical, and environmental interest" in those waters.

Blackstone alleged in Count I of its complaint that Gallo Builders, Robert Gallo, and Steven Gallo had violated 33 U.S.C. §§ 1311(a), 1342, and accompanying regulations, 40 C.F.R. §§ 122.26(b)(14)(x), 122.28, by failing to obtain a Construction General Permit for Gallo Builders from the EPA for the site at

- 6 -

issue, given that Gallo Builders was an operator of the construction site and that the site disturbed five or more acres of land and discharged pollutants from a point source into waters of the United States. Blackstone alleged in Count II of the complaint that Gallo Builders, Arboretum Village, Robert Gallo, and Stephen Gallo had violated 33 U.S.C. §§ 1311(a), (e), 1365(f)(1), (7), and 1342 by failing to comply with numerous provisions of the Construction General Permit that Arboretum Village had obtained from the EPA due to "longstanding and habitual neglect of erosion and sediment control" at the construction site.

With respect to the latter claim, Blackstone alleged that "[a]s a result of Defendants' [Federal] CWA violations, sediment-laden stormwater runoff from the Site is polluting waters of the United States, particularly the Blackstone River, its tributaries, and wetlands adjacent to those tributaries." Blackstone alleged that sediment-laden discharges had occurred "on days including but not limited to October 16, 2015, January 10, 2016, February 3, 2016, February 16, 2016, February 24, 2016, February 25, 2016, March 1, 2016, and April 7, 2016."

Blackstone sought a declaratory judgment that the defendants were in violation of the Federal CWA by both failing to obtain Construction General Permit coverage for Gallo Builders and by violating the conditions of the Construction General Permit held by Arboretum Village. Blackstone also sought an injunction

prohibiting further violations of the Federal CWA, requiring that the defendants restore any polluted wetlands and waters, and requiring that the defendants report future issues with stormwater discharges at the site to the EPA and to Blackstone. In addition, Blackstone sought an assessment of civil penalties under section 309(d) of the Federal CWA, 33 U.S.C. § 1319(d), and an award of attorneys' fees.

On August 30, 2016, all four defendants jointly moved to dismiss both claims that Blackstone had brought against them in its suit on the ground that each of the claims was barred by the statutory preclusion provision of the Federal CWA set forth in section 309(g)(6)(A)(ii), which bars "civil penalty action[s]" brought by either the federal government under section 309(d) or by citizens via citizen suits insofar as such actions concern "any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable this subsection." 33 U.S.C. § 1319(g)(6)(A)(ii). The motion also sought the dismissal of the claim set forth in Count I of the complaint, which concerned Construction General Permit coverage, on the independent ground that Arboretum Village alone had operational control over the construction site and thus that only it needed to obtain (and had already obtained) a Construction General Permit from the EPA for the site.

The District Court denied the defendants' motion to dismiss Blackstone's two claims but instructed the parties to engage in a limited period of discovery concerning whether section 309(g)(6)(A)(ii) of the Federal CWA precluded them from going forward. At the close of that limited discovery period, the defendants then proceeded to move for summary judgment as to both of Blackstone's claims.

The motion for summary judgment, which Blackstone opposed, again asserted that section 309(g)(6)(A)(ii) barred both of Blackstone's claims. In addition, Blackstone filed a cross-motion requesting "summary judgment that this action is not barred by the 'diligent prosecution' provision of Section 309(g)(6)(A)(ii) of the Federal Clean Water Act."

On September 30, 2018, the District Court issued an order that both denied Blackstone's cross-motion for summary judgment and partially granted the defendants' summary judgment motion, insofar as that motion concerned the claim in Count II of Blackstone's complaint, which alleged unauthorized sediment-laden stormwater discharges. Blackstone Headwaters Coal., Inc. v. Gallo Builders, Inc., No. 16-cv-40053-TSH, 2018 WL 4696749, at *2 (D. Mass. Sept. 30, 2018); see Blackstone Headwaters Coal., Inc. v. Gallo Builders, Inc., No. 16-cv-40053-TSH, 2018 WL 5795832, at *1 (D. Mass. Oct. 31, 2018) (clarifying that the earlier summary judgment ruling did not affect the claim concerning Gallo Builders'

- 9 -

failure to obtain permit coverage).  The District Court determined that the MassDEP had "exercised its enforcement powers with respect to the Site" both in issuing the UAO and in executing the ACOP. Blackstone, 2018 WL 4696749, at *2.  The District Court further found that the ACOP imposed "a series of enforceable obligations on Defendants designed to bring the Site into compliance" and that the MassDEP had, after executing that agreement, "monitored the Site . . . on an ongoing basis."  Id.  Thus, the District Court concluded, "the cumulative actions of the MassDEP form[] the basis of a substantial, considered and ongoing response to the violation" alleged in Blackstone's complaint against all the defendants concerning stormwater discharges, and the "circumstances of this case demonstrate ongoing diligent prosecution."  Id.

The defendants then moved on June 28, 2019, for summary judgment as to the remaining claim by Blackstone, which was set forth in Count I of the complaint and concerned Construction General Permit coverage.  The District Court granted this motion, which Blackstone had opposed, on September 30, 2019.  It reasoned that the defendants were right that the claim alleged merely a "technical violation" of the Federal CWA and its implementing regulations and so was not actionable in a citizen suit under that statute.  Blackstone Headwaters Coal., Inc. v. Gallo Builders, Inc., 410 F. Supp. 3d 299, 302-03 (D. Mass. 2019).  The District Court explained that it regarded the alleged violation as merely

- 10 -

"technical" because Arboretum Village did have coverage under an EPA-issued Construction General Permit and both Arboretum Village and Gallo Builders were controlled by the same individuals -- namely, "Robert H. Gallo, his wife Janice Gallo and their son Steven Gallo." Id.

The District Court entered judgment for the defendants on September 30, 2019, and, on October 29, 2019, Blackstone timely appealed. Blackstone's Notice of Appeal referenced (1) the District Court's order granting summary judgment against Blackstone as to its claim in Count II, which concerned alleged unauthorized sediment-laden stormwater discharges, and denying Blackstone's cross-motion for summary judgment as to the applicability of the statutory preclusion bar in section 309(g)(6)(A)(ii) of the Federal CWA; (2) the District Court's order granting summary judgment against Blackstone as to the claim in Count I, which concerned Gallo Builders' alleged failure to obtain the required permit coverage; and (3) the judgment of dismissal.

We have jurisdiction to review both the District Court's award of summary judgment to the defendants and its denial of summary judgment to Blackstone. See OneBeacon Am. Ins. Co. v. Com. Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012); see also Crowley v. Nevada ex rel. Nev. Sec'y of State, 678 F.3d 730, 734 (9th Cir. 2012) ("When the district court disposes of a case on cross-motions for summary judgment, we may review

- 11 -

both the grant of the prevailing party's motion and the corresponding denial of the opponent's motion."); LM Ins. Corp. v. Dubuque Barge & Fleeting Serv. Co., 964 F.3d 1247, 1249 (8th Cir. 2020) (similar). Our review of the District Court's summary judgment rulings is de novo. See Petitti v. New Eng. Tel. & Tel. Co., 909 F.2d 28, 30 (1st Cir. 1990) ("Both denial[s] and grants of summary judgment are reviewed de novo."). "Summary judgment is appropriately granted where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Vives v. Fajardo, 472 F.3d 19, 21 (1st Cir. 2007) (citing Fed. R. Civ. P. 56(c)).

## II.

We start with Blackstone's challenge to the District Court's grant of summary judgment to the defendants on the claim that is set forth in Count II of Blackstone's complaint, which is the sediment-laden stormwater discharges claim. The District Court based this ruling on section 309(g)(6)(A)(ii) of the Federal CWA, which, as we have noted, bars "a civil penalty action" instituted pursuant to the citizen suit provision of the Federal CWA (or by the federal government via section 309(d)) to the extent that such an action concerns "any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable this subsection." 33 U.S.C. § 1319(g)(6)(A)(ii).

- 12 -

To address this aspect of Blackstone's appeal, we need to assess four distinct questions that the District Court resolved, either implicitly or explicitly -- (1) whether the prior enforcement action by the MassDEP was commenced and prosecuted "under a State law comparable" to section 309(g) of the Federal CWA; (2) whether, insofar as the MassDEP's enforcement action was commenced and prosecuted under such a comparable law, it sought to enforce the same violation that Blackstone claims in its suit under the Federal CWA; (3) whether, if those first two requirements of the Federal CWA's preclusion bar are satisfied, the MassDEP was "diligently prosecuting" the enforcement action when Blackstone filed its complaint; and (4) whether Blackstone's suit is "a civil penalty action." We consider each of these issues in turn.

**A.**

We begin with the "comparable" law issue. Our focus is twofold, as the parties' dispute with respect to the District Court's ruling on this issue concerns both which law the MassDEP brought the prior enforcement action "under" and whether that "law," once identified, qualifies as "comparable" to section 309(g) of the Federal CWA.

**1.**

Massachusetts is one of just three States (the others being New Hampshire and New Mexico) that has not sought and received authorization under section 402(b) of the Federal CWA, 33

- 13 -

U.S.C. § 1342(b), to assume responsibility for administering the Federal CWA's National Pollution Discharge Elimination System permit program -- which includes Construction General Permits -- within its borders. Thus, this is not a case in which the relevant state enforcement action -- the one brought by the MassDEP that resulted in the UAO and then the ACOP and the Final Decision -- was brought pursuant to a state law that itself administers the Federal CWA. See, e.g., Paolino v. JF Realty, LLC, 830 F.3d 8, 11-12 (1st Cir. 2016) (discussing enforcement activity by the Rhode Island Department of Environmental Management under the state-assumed Rhode Island Discharge Elimination System permitting program); see also 133 Cong. Rec. 1,264 (1987) (statement of Sen. Chafee) ("[I]f a State has received authorization under section 402 to implement a particular permitting program . . . it [can] prosecute a violation of Federal law."); 131 Cong. Rec. 15,635-38 (1985) (statement of Sen. Wallop) (similarly indicating that "States with approved programs" "under the Clean Water Act" are "administer[ing]" that Act).

Nonetheless, in North & South Rivers Watershed Ass'n v. Town of Scituate, 949 F.2d 552 (1st Cir. 1991), we held, based on the arguments presented there, that an enforcement action undertaken by the MassDEP under the Massachusetts Clean Waters Act, Mass. Gen. Laws ch. 21, §§ 26-53 ("the Massachusetts CWA"), amounted to "action [under a state law] comparable to section

- 14 -

309(g)" of the Federal CWA, Scituate, 949 F.2d at 554, 556, and thus we found the "comparable" law requirement of the Federal CWA's preclusion bar satisfied in that case by the MassDEP's action to enforce the Massachusetts CWA.[5]

Here, the District Court did not expressly identify the Massachusetts law "under" which the MassDEP had commenced and prosecuted the administrative proceedings that it held triggered the Federal CWA's preclusion bar. See Blackstone, 2018 WL 4696749, at *1-2. The District Court, however, did invoke our decision in Scituate in holding that those proceedings by the MassDEP were brought "under a State law comparable to" section 309(g) the Federal CWA, Blackstone, 2018 WL 4696749, at *1 (quoting 33 U.S.C. § 1319(g)(6)(A)(ii)), which arguably indicated that the District Court understood the Massachusetts CWA to have been the law "under" which the MassDEP had been operating -- at least in part -- when bringing the preclusive prior state enforcement action here.

Due in part to the ambiguity on that score, however, Blackstone moved for clarification following the District Court's initial ruling. In that motion, Blackstone sought to determine more definitively the law "under" which the District Court understood the MassDEP enforcement action to have been brought for

---

[5] Scituate cautioned, however, that certain arguments "not raised by the parties" were not considered in the course of adjudicating that appeal. 949 F.2d at 556 n.8.

- 15 -

purposes of the Federal CWA's preclusion bar. The District Court granted the motion to clarify and explained, while again invoking Scituate, that the proposition that the Federal "CWA has a comparable state law in the Massachusetts Clean Waters Act is well established in this District." Blackstone, 2018 WL 5795832, at *1 (first citing Mass. Gen. Laws ch. 21, § 44; then citing Scituate, 949 F.2d at 555-56).

We thus proceed on the understanding that the District Court based its summary judgment decision in favor of the defendants as to the applicability of the preclusion bar on the following rationale: that the MassDEP was proceeding "under," at least in part, the Massachusetts CWA; and that the Massachusetts CWA is itself "comparable" to section 309(g) of the Federal CWA for purposes of the preclusion bar based on the reasoning we set forth in Scituate. It is on this basis, then, that we understand the District Court to have held, as a matter of law, that the "comparable" law requirement of the Federal CWA's preclusion bar had been satisfied.

Blackstone does not dispute that the Massachusetts CWA qualifies as a "comparable" law for purposes of the Federal CWA's preclusion bar, as it does not dispute Scituate's holding on that point. But, Blackstone contends, the MassDEP's enforcement action was not commenced and prosecuted "under" the Massachusetts CWA, even in part. Instead, Blackstone contends, that enforcement

- 16 -

action was brought only "under" the Massachusetts Wetlands Protection Act, Mass. Gen. Laws ch. 131, § 40 ("the MWPA"). That is clear, Blackstone contends, from a review of the relevant enforcement documents -- the UAO, the ACOP, and the Final Decision -- as Blackstone notes their repeated invocation of the MWPA. Moreover, Blackstone asserts that the MWPA does not itself qualify as a "comparable" law, even under the reasoning relied on in Scituate. For that reason, Blackstone contends, the District Court erred in finding the "comparable" law requirement satisfied as a matter of law and thus its grant of summary judgment to the defendants based on the preclusion bar must be overturned.

According to the defendants, we need not decide whether Blackstone is right that the MassDEP's enforcement action was not in fact commenced and prosecuted even in part under the Massachusetts CWA and that it was instead commenced and prosecuted solely under the MWPA. The defendants point out that there is no dispute that the MassDEP's action was commenced and prosecuted at least in part under the MWPA. Thus, they contend that we need only address whether the MWPA is itself a "comparable" law under the standard set forth in Scituate and they assert that it is.

The District Court, as we have explained, did not address whether the MWPA is a "comparable" law in granting summary judgment based on the preclusion bar to the defendants. But, the question is one of law, and we may affirm the District Court's summary

- 17 -

judgment ruling on any ground manifest in the record. See Saccoccia v. United States, 955 F.3d 171, 172 (1st Cir. 2020).

Nevertheless, we cannot affirm the District Court's ruling on this ground. Scituate held that a state law measure that "closely parallels" the administrative penalties subsection of the Federal CWA, 309(g), could qualify as a "comparable" law, 949 F.2d at 554, 556, and that the Massachusetts CWA met that "closely parallels" standard because it "contains penalty assessment provisions comparable to the Federal Act, . . . the State is authorized to assess those penalties, and . . . the overall scheme of the two acts is aimed at correcting the same violations, thereby achieving the same goals," id. at 556. But, Scituate did not address whether the MWPA similarly could meet the "closely parallels" standard. And, even assuming, as we did in Scituate, that a state law need not have been "certified by the EPA under section 402 of the Federal Clean Water Act," id. at 556 n.8,[6] to qualify as "comparable," the defendants' contention that the MWPA qualifies as "comparable" under Scituate is without merit.

---

[6] Although in Scituate the EPA had raised the argument that the state law had to be certified in order to be "comparable" as an amicus, the parties themselves had not done so, and thus Scituate did not consider it. 949 F.2d at 556 n.8. Similarly here, neither party contends that the statutory preclusion bar in section 309(g)(6)(A)(ii) of the Federal CWA is applicable only when the state law in question has been certified under section 402(b), 33 U.S.C. § 1342(b).

The primary prohibition in the Federal CWA provides that "[e]xcept as in compliance with [the Federal CWA], the discharge of any pollutant" into "the waters of the United States" "by any person shall be unlawful." 33 U.S.C. §§ 1311(a), 1362(7), (12); see also 33 U.S.C. § 1342(k) ("Compliance with a permit issued pursuant to this section shall be deemed compliance . . . with section[] 1311 . . . ."). The Massachusetts CWA similarly prohibits the "discharge of any pollutant into waters of the commonwealth, except in conformity with a permit," Mass. Gen. Laws ch. 21, § 42; see Entergy Nuclear Generation Co. v. Dep't of Env't Prot., 944 N.E.2d 1027, 1033 (Mass. 2011) ("Like the Federal Act, the [Massachusetts CWA] creates a comprehensive permitting program to ensure water quality standards are met."), and administrative penalties may likewise be assessed against those who violate that prohibition, see Scituate, 949 F.2d at 556 (citing Mass. Gen. Laws ch. 21A, § 16).

But, the MWPA's prohibitions are both broader and narrower than the Federal CWA's. Rather than prohibiting the unauthorized discharge of pollutants into water, they regulate instead "project[s that] involve[] work in a wetlands area." Ten Loc. Citizen Grp. v. New Eng. Wind, LLC, 928 N.E.2d 939, 941 (Mass. 2010); see Mass. Gen. Laws ch. 131, § 40 (providing that "[n]o person shall remove, fill, dredge, or alter" enumerated wetlands unless such person files a "notice of intention" to do so with

- 19 -

state and local regulators and, if necessary, "receiv[es] and compl[ies] with an order of conditions").[7]  And, to the limited extent that the MWPA's implementing regulations do purport to direct that activity "shall not impair . . . surface water quality," e.g., 310 C.M.R. §§ 10.54(4), 10.56(4), they apply only if the activity in question will "remove, fill, dredge or alter" MWPA-protected lands, id. §§ 10.02(2)(a), 10.51, and only if those lands are also deemed significant to certain statutorily-enumerated interests, see Mass. Gen. Laws ch. 131, § 40; 310 C.M.R. § 10.05(6).

Thus, even assuming that the "overall scheme" of the Massachusetts CWA is "aimed at correcting the same violations" as the Federal CWA, Scituate, 949 F.2d at 556, given how "closely" the former "parallels" the latter, id. at 554, the same cannot be said of the MWPA.  Accordingly, we agree with Blackstone that the MWPA, "[a]s its name would suggest . . ., is designed to protect wetlands.  It has neither the purpose nor the effect of protecting the nation's waters more broadly."

---

[7] See also, e.g., Miramar Park Ass'n v. Town of Dennis, 105 N.E.3d 241, 250 (Mass. 2018) ("The [MWPA] requires that projects that affect wetlands . . . and that affect interests identified in the act, may take place only after receipt of a permit from an appropriate issuing body . . . .").

**2.**

That brings us, then, to the question of whether a "reasonable juror [necessarily would] have found in the defendant[s'] favor," Primarque Prods. Co. v. Williams W. & Witts Prods. Co., 988 F.3d 26, 36 (1st Cir. 2021), that the MassDEP's enforcement action was "commenced and . . . prosecut[ed]" -- at least in part -- "under" the Massachusetts CWA, as we understand the District Court to have ruled, see Blackstone, 2018 WL 5795832, at *1. For, if that action on any reasonable view of the record was prosecuted in part under the Massachusetts CWA, then even Blackstone agrees that the "comparable" law requirement is satisfied as matter of law, because, as we have noted above, Blackstone does not dispute that the Massachusetts CWA is itself a "comparable" law for purposes of the Federal CWA's preclusion bar.

Blackstone acknowledges that the enforcement documents -- the UAO, the ACOP, and the Final Decision -- do not exclusively reference the MWPA. All three documents also require the respondent -- Arboretum Village -- to "take every reasonable step to prevent further violations of the Wetlands Protection Act and

the Massachusetts Surface Water Quality Standards."[8]  (emphases added).

Notably, those water quality standards are promulgated pursuant to authority granted the MassDEP by the Massachusetts CWA.  See Mass. Gen. Laws ch. 21, § 27(5); 314 C.M.R. § 4.00. Moreover, the UAO expressly invokes the MassDEP's authority "to issue orders to any person in violation of any law or regulation [that the] MassDEP is authorized to enforce," (emphasis added), and the ACOP -- which states that the parties entered into it "in order to finally resolve the . . . adjudicatory proceeding" commenced by the issuance of the UAO -- imposes obligations on the defendants to take action to prevent sediment-laden stormwater discharges going forward.  The ACOP at no point states that those obligations are being imposed solely to ensure compliance with the MWPA and not also to ensure compliance with the Massachusetts Surface Water Quality Standards, which, as we have observed, are promulgated pursuant to the Massachusetts CWA.[9]

Blackstone nevertheless contends that the enforcement documents do not actually set forth a "charge of any violation of

---

[8] Blackstone does not argue that the fact that only Arboretum Village was named as a respondent in these documents is significant.

[9] Blackstone makes no argument to the effect that the UAO and the ACOP are part of different "actions" that may have been commenced and prosecuted under separate laws.

the [Massachusetts] CWA or any regulation promulgated thereunder," because the documents imposed only a "prospective requirement" that the defendants "prospectively comply with the Massachusetts Surface Water Quality Standards." It therefore asserts that the MassDEP's action was not brought "under" a "comparable" law within the meaning of section 309(g)(6)(A)(ii).

But, given the features of the enforcement documents that we have just described that implicate the Massachusetts CWA and not only the MWPA, the documents do not indicate that the MassDEP imposed merely a bare requirement to comply in the future with the Massachusetts CWA, through the Massachusetts Surface Water Quality Standards that were promulgated pursuant to it, such that the Massachusetts CWA did not itself form a basis for the underlying enforcement action. Cf. Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc., 728 F.3d 868, 876 (9th Cir. 2013) (reasoning that an imposed "condition [that] merely requires Defendants to abide by legal obligations [concerning stormwater discharges] other than those that the parties [actually] litigated . . . does not transform . . . actions into ones to require compliance with the Clean Water Act"). Nor does Blackstone develop any argument that we may look beyond the face of the enforcement documents themselves to determine what law the MassDEP was acting "under" in its prior enforcement action. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). And we are

- 23 -

reluctant to treat Blackstone as having developed any such argument for us to countenance such a searching inquiry into the MassDEP's motivations in bringing its prior enforcement action, given the complexities that a deep dive into agency motivation of that sort would entail and given that Blackstone does not attempt to address any of those complexities. Accordingly, based on what the enforcement documents themselves reveal and the nature of the arguments Blackstone makes to us, we decline to disturb the District Court's determination that the MassDEP's prior enforcement action was commenced and prosecuted in part "under" a "comparable" law -- the Massachusetts CWA -- for purposes of the preclusion provision at section 309(g)(A)(6)(ii).[10]

**B.**

We next address Blackstone's contention that the District Court erred in awarding summary judgment to the defendants on Blackstone's sediment-laden stormwater discharges claim in Count II of its complaint on the ground that the claim does not allege the same violation as the MassDEP's enforcement action targeted. See 33 U.S.C. § 1319(g)(A)(6)(ii) (barring "a civil penalty action" concerning "any violation . . . with respect to which a State has commenced and is diligently prosecuting an

---

[10] We stress again that we are not deciding the merits of any argument regarding the "comparable" law requirement not raised by the parties in this proceeding. See Scituate, 949 F.2d at 556 n.8.

- 24 -

action" (emphasis added)); Francisco Sánchez v. Esso Standard Oil Co., 572 F.3d 1, 10 (1st Cir. 2009) (reading similar preclusion provision to "impl[y] that the government action does not preclude a citizen suit against other violations" (quoting Jeffrey G. Miller, Theme and Variations in Statutory Preclusions Against Successive Environmental Enforcement Actions by EPA and Citizens: Part One: Statutory Bars in Citizen Suit Provisions, 28 Harv. Env't L. Rev. 401, 473-74 (2004))); see also H.R. Rep. No. 99-1004, at 133 (1986) (Conf. Rep.) ("This limitation applies only to an action for civil penalties for the same violations which are the subject of the administrative civil penalties proceeding." (emphasis added) (discussing Senate bill)); id. at 136 ("[W]here an administrative penalty is being pursued, a citizen suit may not be filed for the same violation." (emphasis added) (discussing House amendment)). Blackstone does not suggest in pressing this contention that the MassDEP's focus was solely on the MWPA and thus not on a violation of the Massachusetts CWA. Rather, we understand Blackstone to be contending only that, even if the MassDEP's enforcement action was brought under the Massachusetts CWA, that action did not concern the same violation as the one that Blackstone is alleging in the claim set forth in Count II of its complaint because Blackstone's claim "targets the causes" of the defendants' water pollution (such as "the defective design of Defendants' stormwater management and erosion and sediment control

- 25 -

systems"), and the MassDEP's enforcement action targeted only the defendants' "pollution, per se (their silt-laden discharges)."[11]

But, as the defendants point out, the MassDEP's enforcement action, no less than Blackstone's claim in Count II of its citizen suit, also targeted the causes of the sediment-laden stormwater discharges. Indeed, the descriptions of the "violations" "observed" at the construction site in both the UAO and the ACOP made note of not only "[d]ischarge(s) of silt-laden runoff" but also the presence of "unstable, eroded suspended soils at the Site." And, as the ACOP explained, the MassDEP as a result of these observed violations "directed [Arboretum Village] . . . to prepare a comprehensive erosion and sedimentation plan [and] a slope stabilization plan."[12] Moreover, the resulting "Erosion Control Plan" -- which the ACOP required Arboretum Village to "implement" -- called for, as descriptions of it in the record make clear, "slope stabilization" (regrading) at one area of the site; planting a "hydroseeded area" to reduce stormwater runoff; and erecting "haybales, berms, swales, [and]

---

[11] We need not address the defendants' contention that Blackstone waived this argument by asserting it only in opposition to the defendants' motion to dismiss, because the argument does not succeed on the merits in any event. See Primarque, 988 F.3d at 39 n.11 (1st Cir. 2021) (citing United States v. Leavitt, 925 F.2d 516, 517 (1st Cir. 1991)).

[12] The ACOP also mandated that Arboretum Village take "every reasonable step to prevent further violations." (emphasis added).

temporary ponds" including "two sediment basins." And, correspondence between Robert Gallo and the MassDEP confirms that the basic premise of the Erosion Control Plan was to "provide[] for a myriad of BMPs"[13] to "allow[] for stormwater control during construction while the site was being built out until the site ha[d] been permanently stabilized."

Blackstone separately argues that the stormwater discharge violations that it alleges in the claim set forth in Count II of its complaint are not the "same violations" that the MassDEP targeted "because they occurred later in time." Here again, in advancing this argument Blackstone does not appear to be disputing that the MassDEP's action was brought under a comparable law and thus does not appear to be disputing that it was brought under the Massachusetts CWA. Instead, it appears to be contending only that, even on that understanding, the same violation requirement of the statutory preclusion bar is not satisfied based on the timing of the targeted violations.

Blackstone points out in this regard that the MassDEP in its prior enforcement action "alleged violations occurring on three days in June 2013," while the count in the complaint setting forth the sediment-laden stormwater discharges claim "alleged

_____

[13] BMPs, or "Best Management Practices," are methods used to control or prevent stormwater runoff and the discharge of pollutants, such as sediments, into waterbodies.

violations occurring thereafter and persisting through . . . 2016." But, the MassDEP's enforcement action culminated in a consent agreement -- the ACOP -- that contained forward-looking provisions, such as those imposing stipulated administrative penalties[14] and commanding that Arboretum Village implement the Erosion Control Plan, that were designed to ameliorate future issues at the site no less than its imposition of an $8,000 civil administrative penalty was meant to penalize the violations observed in June of 2013.

That is significant because in Scituate the MassDEP had "alleged that Scituate owned and operated a sewage treatment facility that was [unlawfully] discharging pollutants into a coastal estuary," and, in 1987, the MassDEP "ordered Scituate to . . . take all steps necessary to plan, develop and construct new wastewater treatment facilities [and to] . . . begin extensive upgrading of the facility subject to the [Mass]DEP's review and approval at interim stages of the planning, designing, and construction phases." 949 F.2d at 553-54.[15] We then reasoned that

---

[14] The ACOP provided for "stipulated civil administrative penalties to the Commonwealth in the amount of $100.00 per day" "if [Arboretum Village] violates any provision of the Consent Order," and further reflected that Arboretum Village had agreed to be subject to "additional high level enforcement action from [the] MassDEP" if "[a]ny further discharges of turbid stormwater runoff to wetland resource areas in excess of 150 NTUs" occurred.

[15] The MassDEP in 1987 "elected not to assess penalties against Scituate at the time of issuing its [o]rder, but did reserve the right to do so at a later date." Scituate, 949 F.2d at 554.

- 28 -

a citizen suit alleging factually similar but chronologically later discharge violations was "duplicative" of the MassDEP's 1987 order because it sought a remedy for a violation that "[wa]s already in the process of being remedied by the [1987] State Administrative Order" and that allowing a citizen suit to proceed "at a time when remedial measures are all well underway do[es] not further [the Federal CWA's] goal[s]" but instead erects an "impediment[] to environmental remedy efforts." Id. at 553-58; see also Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist., 382 F.3d 743, 762-63 (7th Cir. 2004) ("Levying additional penalties on violators who are undertaking massive remedial projects will not bring about compliance any faster or cause the result to be any more effective -- it will just cause the result to be more expensively arrived at.").

Blackstone does attempt to distinguish Scituate in its reply brief by contending that the MassDEP's order in that case was "too complex to be complied with immediately," whereas here, Blackstone contends, "compliance is not complicated." But, this contention would appear to be at odds with the only contention that Blackstone raised in its opening brief -- that the differences in the timing of the occurrence of the violations targeted in, respectively, the MassDEP's enforcement action and Blackstone's own citizen suit under the Federal CWA in and of themselves prevented the same violation requirement from being met. No

- 29 -

suggestion was made in Blackstone's opening brief that such differential timing did not in and of itself prevent that requirement from being satisfied in cases where the state action resulted in a remedy that crosses some unspecified threshold of complexity not present here. See Villoldo v. Castro Ruz, 821 F.3d 196, 206 n.5 (1st Cir. 2016) ("[N]ew arguments may not be raised for the first time in a reply brief." (citing Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 354 (1st Cir. 1992))). Thus, at least on this record, we agree with the defendants that the District Court did not err in finding the same violation requirement satisfied as a matter of law.

## C.

We now take up Blackstone's contention that the District Court erred in granting summary judgment to the defendants on the claim set forth in Count II of Blackstone's complaint based on the Federal CWA's preclusion bar, because the record does not show, as a matter of law, that the MassDEP was "diligently prosecuting" its action under the Massachusetts CWA. 33 U.S.C. § 1319(g)(6)(A)(ii). We disagree.

The "'great volume of enforcement actions are intended to be brought by the State,' [and] citizen suits are proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.'" Scituate, 949 F.2d at 557 (alteration omitted) (quoting Gwaltney of Smithfield, Ltd. v.

- 30 -

Chesapeake Bay Found., Inc., 484 U.S. 49, 60 (1987)). For that reason, "[c]itizen-plaintiffs must meet a high standard to demonstrate that [an agency] has failed to prosecute . . . diligently." Karr v. Hefner, 475 F.3d 1192, 1198 (10th Cir. 2007); see also Piney Run Pres. Ass'n v. Cnty. Comm'rs, 523 F.3d 453, 459 (4th Cir. 2008) (similar); Scituate, 949 F.2d at 557 ("Where an agency has specifically addressed the concerns of an analogous citizen's suit, deference to the agency's plan of attack should be particularly favored.").

The District Court determined that "[t]he circumstances of this case demonstrate ongoing diligent prosecution." Blackstone, 2018 WL 4696749, at *2. It observed that the "ACOP imposed . . . a series of enforceable obligations on Defendants designed to bring the Site into compliance and to maintain compliance and promulgated standards to measure compliance," id., while at the same time "reserv[ing] to the MassDEP a full set of enforcement vehicles for any instances of future non-compliance," id.; see also Scituate, 949 F.2d at 557; Grp. Against Smog & Pollution, Inc. v. Shenango Inc., 810 F.3d 116, 128 (3rd Cir. 2016) ("Courts have concluded, in cases similar to ours, that consent decrees already entered into by administrative agencies and

- 31 -

polluting entities were capable of constituting diligent prosecutions." (collecting cases)).[16]

Moreover, the District Court determined that, after the ACOP was approved in December 2014, it was indisputable that the MassDEP "monitored the Site and . . . collected data and analysis from the Defendants, from Defendants' outside engineers and from municipal sources on an ongoing basis." Blackstone, 2018 WL 4696749, at *2. The District Court thus found, as a matter of law, that "the cumulative actions of the MassDEP form[] the basis of a substantial, considered and ongoing response to" the issues that Blackstone is now attempting to pursue via its stormwater discharges claim. Id.

In line with the District Court's assessment, the record indisputably shows that between December 22, 2014, when the ACOP was finally approved, and May 6, 2016, when Blackstone's suit was filed, the MassDEP (1) conducted numerous site visits to sample turbidity levels and to evaluate the defendants' stormwater management practices; (2) collected turbidity data and other information about the state of stormwater control measures at the site from the defendants on an ongoing basis; (3) sent multiple

---

[16] The defendants separately contend that the mere existence of the UAO and the ACOP necessarily establish diligent prosecution. The defendants cite no case law to support that expansive proposition, which runs counter to Scituate. See 949 F.2d at 557 ("The bar against citizen's suits also requires that the State diligently enforce its [o]rder[s].").

- 32 -

letters to the defendants and their environmental consultant detailing "concerns" with the site, such as "issues with stormwater management" that the MassDEP said "must be corrected," and advising the defendants to implement a revised Erosion Control Plan as well as to "revisit the ACOP . . . [to] insure that the site is in compliance with the requirements therein"; (4) met with the defendants on multiple occasions to discuss stormwater control issues at the site and the need for an updated Erosion Control Plan; and (5) deliberated internally about the best way to remediate ongoing issues with the site, which included "investigat[ing] . . . whether or not to exercise [the MassDEP's] discretion" to bring a "high-level enforcement action." Further, as the District Court detailed, see Blackstone, 2018 WL 4696749, at *2, the MassDEP during this period left "open the possibility of imposing penalties upon" the defendants, Scituate, 949 F.2d at 557.

We agree with the defendants that the MassDEP's actions preceding Blackstone's suit "ampl[y] . . . demonstrate[] [the agency's] ongoing involvement vis-à-vis" the construction site. Paolino, 830 F.3d at 16; see also Scituate, 949 F.2d at 557. We note, moreover, that there is no trace of the "dilatory, collusive or otherwise . . . bad faith" behavior by the agency of the sort that has concerned other courts. E.g., Pitroff v. United States, No. 16-cv-522-PB, 2017 WL 3614436, at *5 (D.N.H. Aug. 22, 2017)

- 33 -

(quoting Conn. Fund for the Env't v. Cont. Plating Co., 631 F. Supp. 1291, 1293 (D. Conn. 1986)).

Blackstone nevertheless contends that the District Court erred in finding that the MassDEP's activity just described was diligent as a matter of law because the record supportably shows that a "staff shortage" had forced the agency to make fewer visits to the site during the year after the ACOP was executed than it otherwise might have done and because the record supportably shows that the agency "delegated" some of its monitoring activity to a consultant hired by the defendants. In pressing these contentions, we do not understand Blackstone to be disputing that the MassDEP's enforcement activity with respect to the site was undertaken in part pursuant to the Massachusetts CWA. So understood, these arguments provide no ground for disturbing the District Court's summary judgment ruling with respect to the requirement that the MassDEP be "diligently prosecuting."

The record establishes -- as Blackstone acknowledges -- that, once third-party complaints were received in late 2015 or early 2016 concerning possible stormwater control issues at the site, the MassDEP did dispatch its own analysts on numerous occasions to investigate potential ACOP violations. That the MassDEP -- from the time the ACOP was executed through the moment that Blackstone's suit was filed -- also requested and received data about stormwater discharges from the defendants' consultant

on a periodic basis does not suggest that the MassDEP's enforcement activities themselves were not diligent. See Scituate, 949 F.2d at 557 (finding diligent prosecution in part because the defendant was submitting "test results" about "discharges" in compliance with a MassDEP directive).

To be sure, Blackstone contends that the defendants' consultant was often sampling for turbidity "well after a storm ha[d] ended," as part of a practice calculated to achieve seemingly compliant turbidity levels in reports generated and sent to the MassDEP. But, the evidence in the record showing as much provides no support for the contention that the MassDEP's own efforts were not diligent.

Blackstone also contends that the MassDEP was not diligent in its enforcement activity because, during a period of "increased [MassDEP] involvement" at the construction site from January 2016 to May 2016, the agency was "assuring the[] [defendants] that they were complying with the ACOP despite overwhelming evidence to the contrary." Blackstone's argument on this front focuses on a telephone conversation between a MassDEP official and Robert Gallo that took place on March 9, 2016.

The record reveals, however, that no such assurances were given during that conversation. In fact, an email from the relevant MassDEP official on the date in question reflects that when Robert "Gallo called . . . want[ing] me to write an email

saying he was in compliance," "I told him I couldn't do that." Robert Gallo testified to the same effect in his deposition, acknowledging that the MassDEP official told him "I can't send you that email." And, the email that the MassDEP official ultimately did send to Robert Gallo expressly avoids "venturing an opinion about conditions in the field."[17]

Blackstone more generally asserts that the MassDEP "ignored overwhelming evidence of . . . ACOP violations" presented by third parties and the agency's own analysts in early 2016. But, insofar as Blackstone here accepts that diligent enforcement of the ACOP would constitute diligent enforcement activity with potentially preclusive effect, the problem with this contention is that, as the District Court explained, "[t]he State is entitled to make its own informed decisions about the best possible remedial measures"; merely "because the State may not be taking the precise action the plaintiff wants it to or moving with the alacrity the plaintiff desires does not entitle the plaintiff to relief." Blackstone, 2018 WL 4696749, at *1 (alterations omitted) (quoting Scituate, 949 F.2d at 558).

---

[17] Blackstone also makes much of the fact that, around March 23, the same MassDEP official removed a reference to "violations" from a letter later sent to the defendants. But, the result, once again, was a letter that simply avoided taking a position on whether there were ACOP violations (but which did reference "challenges in dealing with stormwater and erosion control"); not a document that "assured" the defendants that there were no such violations.

- 36 -

Blackstone also argues that the MassDEP's enforcement activity was not diligent in light of the deposition testimony of the MassDEP's Wetlands Section Chief that during Spring 2016 she was "not highly focused on whether the [defendants] ever had a [turbidity] reading of over" 150 NTUs but was instead focused more on whether "there's an impact to the wetland resource areas." Blackstone contends that this testimony amounts to a deficient attempt to "justify [the MassDEP's] failure to take enforcement action" during that period, notwithstanding that the agency had "tools for prosecuting pollution of streams of rivers" even without an impact "on wetlands," including, Blackstone contends, in the ACOP.

Blackstone is correct that the ACOP stated -- as one condition among many -- that "[a]ny further discharges of turbid stormwater runoff to wetland resource areas in excess of 150 NTUs will be grounds for stipulated penalties and/or additional high level enforcement action from [the] MassDEP." But, it was within the realm of the MassDEP's discretion to decide whether to pursue possible violations of that provision alone as opposed to reserving such action for instances in which there were not only readings over 150 NTUs but also observed impacts on nearby wetlands. See Karr, 475 F.3d at 1197 ("[A]n agency's prosecutorial strategy [need not] coincide with that of the citizen-plaintiff."); Ellis v. Gallatin Steel Co., 390 F.3d 461, 477 (6th Cir. 2004) (similar);

- 37 -

cf. United States v. Metro. Water Reclamation Dist., 792 F.3d 821, 825 (7th Cir. 2015) ("Even the most diligent litigator may conclude that settlement is the best option -- if only because it frees up enforcement resources for use elsewhere -- and to achieve a settlement a litigant must accept something less than the most favorable outcome.").

Finally, we reject Blackstone's suggestion that it was hampered in its effort to build its case that the MassDEP was not engaged in diligent enforcement activity because the District Court erroneously refused to allow it to conduct plenary "discovery regarding the Defendants' conduct at the Site." As the defendants note, the record itself contains the fruits of "extensive discovery regarding . . . what was happening at the Site," and Blackstone does not state with any particularity what additional information concerning the site it was unable to seek because of the District Court's discovery rulings, let alone explain how those rulings thereby resulted in a "manifest injustice, that is, . . . substantial prejudice." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 186-87 (1st Cir. 1989); see Martinez ex rel. Martinez v. Garcia, 187 F.3d 622, 1998 WL 1085816, at *1 (1st Cir. 1998) (unpublished) (citing Zannino, 895 F.2d at 17).

**D.**

Blackstone's last argument in support of its contention that the District Court erred in granting summary judgment to the

defendants as to Count II of the complaint is that the statutory preclusion provision in the Federal CWA cannot apply to the extent that Blackstone seeks declaratory and injunctive relief on its stormwater discharges claim. That is so, Blackstone contends, because the provision's plain language restricts requests for "civil penalt[ies]" but not requests for declaratory and injunctive relief. Compare 33 U.S.C. § 1319(g)(6)(A)(ii) ("[A]ny violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a civil penalty action" by the federal government under section 309(d) or by a citizen-plaintiff (emphasis added)), with id. § 1365(a), (b) ("[A]ny citizen may commence a civil action on his own behalf" except "[n]o action may be commenced . . . if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States . . . to require compliance with the standard, limitation, or order . . . ." (emphasis added)).[18]

Blackstone and amici also maintain that the legislative history supports this understanding. See S. Rep. No. 99-50, at 28

---

[18] See also 33 U.S.C. § 1319(b) (authorizing the EPA "to commence a civil action for appropriate relief, including a permanent or temporary injunction . . . in the district court[s] of the United States" (emphases added)); id. § 1319(g) (authorizing the EPA to administratively "assess a . . . civil penalty" of up to $125,000 (emphasis added)).

(1985) ("The potential for overlap between citizen enforcement suits and administrative civil penalties is specifically addressed. . . . [But,] this limitation would not apply to[] an action seeking relief other than civil penalties (e.g., an injunction or declaratory judgment) . . . . The Agency can prevent duplicate proceedings by intervening in the ongoing citizen enforcement suit or by bringing its own judicial action before a citizen suit is filed."); H.R. Rep. No. 99-1004, at 133 (1986) (Conf. Rep.) (similar). Further, they point out, the Tenth Circuit has read section 309(g)(6)(A)(ii) in the manner they advocate. See Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co., 428 F.3d 1285, 1300 (10th Cir. 2005) ("The governing principle behind [section 309(g)(6)(A)(ii)] is to avoid duplicative monetary penalties for the same violation . . . [but that provision] does not apply to equitable relief."); cf. also Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal., 83 F.3d 1111, 1118 (9th Cir. 1996) ("[T]here [i]s no evidence in the legislative history . . . suggest[ing] that Congress intended to extend th[is] bar on citizen suits to a context beyond administrative penalty actions." (citing Wash. Pub. Int. Rsch. Grp. (WashPIRG) v. Pendleton Woolen Mills, 11 F.3d 883, 885-86 (9th Cir. 1993))). But see Ark. Wildlife Fed'n v. ICI Ams., Inc., 29 F.3d 376, 383 (8th Cir. 1994) (reading section 309(g)(6)(A)(ii) to bar injunctive relief "in spite of the plain

language of the statute" because the alternative would be "unreasonable").

But, Blackstone acknowledges, <u>Scituate</u> rejected the very argument that it now advances. <u>See</u> 949 F.2d at 557-58 (concluding, "[b]ased on . . . policy considerations regarding civilian actions" and the fact that the text of 33 U.S.C. § 1365(a) "does not authorize [citizens to seek] civil penalties separately from injunctive relief," that the preclusion bar in section 309(g)(6)(A)(ii) "extends to civil penalty actions . . . [and to] injunctive and declaratory relief" (quotation omitted)). Blackstone makes no timely argument that <u>Scituate</u> is not law of the circuit. As a panel, we are bound by <u>Scituate</u> on this score. <u>See</u> <u>United States</u> v. <u>Lewko</u>, 269 F.3d 64, 66 (1st Cir. 2001).

**E.**

For the foregoing reasons, we decline to reverse the District Court's award of summary judgment to the defendants on the applicability of section 309(g)(6)(A)(ii) to Blackstone's sediment-laden stormwater discharges claim. And, because we so conclude, we must also reject Blackstone's contention that the District Court erred in denying its cross-motion for summary judgment on this same issue. <u>See</u> <u>Littlefield</u> v. <u>Acadia Ins. Co.</u>, 392 F.3d 1, 6 (1st Cir. 2004) ("Cross motions simply require us to determine whether either of the parties deserves judgment as a

matter of law on facts that are not disputed." (quoting Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004))).

**III.**

There remains Blackstone's challenge to the District Court's summary judgment ruling concerning Count I of Blackstone's complaint, concerning the failure of Gallo Builders to obtain coverage under a Construction General Permit from the EPA.[19] The District Court granted the defendants' motion for summary judgment on the ground that Blackstone here alleged only a nonactionable "technical violation" of the Federal CWA, Blackstone, 410 F. Supp. 3d at 302-03, particularly given that, the District Court found, "[d]uring all relevant times in this case, Robert H. Gallo, his wife Janice Gallo and their son Steven Gallo served as the only officers, directors and shareholders of [Gallo Builders] . . . [as well as] the only members of Arboretum Village," id. at 301.

The defendants contend that the District Court was right to rule in their favor given our decision in Paolino v. JF Realty, LLC, 830 F.3d at 16-17, on which the District Court relied, see Blackstone, 410 F. Supp. 3d at 302-03. There, a plaintiff bringing a citizen suit under the Federal CWA asserted a number of claims against the defendant, one of which alleged that the defendant had

---

[19] The defendants do not contend on appeal that the District Court erred in applying the statutory preclusion bar only to Count II of the complaint.

violated a condition in a state-issued National Pollution Discharge Elimination System permit, which required the defendant to "notify [the issuing state agency] of a transfer of ownership" of the underlying property. Paolino, 830 F.3d at 16.

Paolino noted that, in that case, "the transferor [entity] and the recipient [entity] were controlled by the same person, Ferreira" and that Ferreira's identity as the current owner of the property in question was known to the state agency charged with overseeing compliance with the state-issued NDPES permit. Id. at 16-17. Paolino explained that it is "important to distinguish . . . substantive violations" of permit conditions -- such as "failing to maintain best management practices, violating . . . water quality standards, and ignoring monitoring and reporting requirements" -- from the notification-based condition that the plaintiff claimed that the defendants were violating in that case. Id. at 16 (quotation omitted); see id. ("These substantive violations are hardly equivalent to a failure to properly notify [a state agency] of a transfer of ownership . . . ."). The Paolino Court then proceeded on the basis of that distinction to find that the alleged permit violation at issue concerned only notification regarding property ownership and that there was no merit to the plaintiffs' contention that the Federal CWA "authorizes citizen suits for the enforcement of all

conditions of a permit." Id. (alteration omitted) (emphasis added) (quotation omitted).

But, here, the Federal CWA claim set forth in Count I of Blackstone's complaint does not allege simply the violation of a permit condition by the permit holder. The complaint with respect to that claim instead alleges that Gallo Builders is an unpermitted "operator of a construction project that . . . discharges a pollutant from a point source to waters of the United States" in violation of 33 U.S.C. §§ 1311(a), 1342. It thus alleges a violation of the statutory requirement to obtain the permit in question in the event of such discharges, see id., and not merely, like the violation alleged in Paolino, a violation of a condition set forth in a permit that had been obtained but that required "notif[ication] of a transfer of ownership," Paolino, 830 F.3d at 16. Moreover, precisely because the Federal CWA claim set forth in Count I of Blackstone's complaint is alleging a violation of a statutory prohibition against discharging pollutants into U.S. waters without an authorizing permit, that alleged violation certainly is of a kind with the violations of a permit that Paolino itself described as "substantive." Id. (giving as examples "failing to maintain best management practices, violating . . . water quality standards, and ignoring monitoring and reporting requirements" (quotation omitted)).

Thus, Paolino does not support the grant of summary judgment to the defendants here. The defendants identify no other authority -- and we are aware of none -- that supports their position that a citizen suit under the Federal CWA cannot be brought against an entity that is alleged to be an operator of a construction site that is discharging pollutants into U.S. waters in violation of 33 U.S.C. §§ 1311(a), 1342, so long as another entity ultimately controlled by the same individuals has such permit coverage.[20]  Accordingly, we reverse the District Court's ruling on this score.

**IV.**

We **affirm** the District Court's grant of summary judgment to the defendants as well as its denial of Blackstone's cross-motion for summary judgment on the applicability of the statutory preclusion bar found at section 309(g)(6)(A)(ii) of the Federal CWA with respect to Count II of Blackstone's complaint; **reverse** the District Court's grant of summary judgment to the defendants on Count I of that complaint; and **remand** for further proceedings consistent with this opinion.

The parties shall bear their own costs.

---

[20] We note that the defendants have made no contention during these proceedings that the lack of Gallo Builders' permit coverage was the result of a scrivener's error.

- 45 -